In re HEDGESIDE DISTILLERY CORP.

No. 11327.

United States District Court, N. D. California, N. D.

Aug. 23, 1952.

Ehrlich, Axelrod & Hecht, San Francisco, for bankrupt.

Francis P. Walsh, San Francisco, Cal., for trustee.

Fisk, Chickening & Gregory, San Francisco, Cal., for Anglo California Nat. Bank.

Bronson, Bronson & McKinnon, San Francisco, Cal., for Schenley.

Rogers & Clark, San Francisco, Cal., for Silverado Grape Growers Cooperative Vineyards.

LEMMON, District Judge.

The trustee of a bankrupt distillery whose president is languishing in San Quentin and two bona fide claimants of opposing interests in thousands of barrels of whisky and grain spirits—these are the protagonists in this complicated forensic drama.

At stake is the ownership of merchandise valued at hundreds of thousands of dollars. The hearing before the Referee in Bankruptcy consumed thirty-six days of trial time. The testimony is reported in 2,523 pages of transcript. In addition, thousands of documents were introduced in evidence. Yet, as will be more fully developed presently, the very parties that are here objecting to the Referee's order have repeatedly insisted that "the material facts are not in dispute" and that *the present petition for review presents only questions of law*". The questions of law, however, are many, diverse, and complex.

### 1. The Dramatis Personae.

Because the cast of characters is somewhat large, the Court is adopting the shortened individual and corporate designations used by the parties in this Court and in the hearings before the Referee in Bankruptcy:

Schenley Industries, Inc. ... . "Schenley"
Hedgeside Distillery Corporation ................. "Hedgeside"
R. I. Stone .............. "Stone"
Franciscan Farm and Livestock Corporation ....... "Franciscan"
Glaser Bros. ............. "Glaser"
Barnhill Distilleries Company ................. "Barnhill"
The Anglo California National Bank of San Francisco ................. "Bank"
Heaven Hill Company ...... "Heaven Hill".

The word "barrels" includes the contents as well as the receptacles.

### 2. The Reclamation Petition.

On October 3, 1949, Schenley filed a reclamation petition in this Court. The petition sets forth that on or about May 17, 1949, an involuntary petition in bankruptcy was filed in this Court by certain named creditors of Hedgeside, and that the latter was adjudicated a bankrupt on June 2, 1949, on which date the proceedings were referred to Bernard J. Abrott, Referee in Bankruptcy.

The reclamation petition contains the following further allegations:

On July 26, 1949, Charles W. Ebnother was appointed Trustee of the bankrupt's property. At the time of the filing of the petition in bankruptcy, the bankrupt had in its possession, and the Trustee now holds, 2,893 barrels of whisky and 6,040 barrels of grain spirits, or a total of 8,933 barrels, stored in bond for Schenley in Hedgeside's Internal Revenue Bonded Warehouse No. 2, hereinafter referred to as "No. 2", at Napa, California.

The barrels of whisky and grain spirits are covered by warehouse receipts issued by Hedgeside, the bankrupt, and now held by Schenley, which is the owner of the whisky and the spirits.

Schenley has been informed and believes and therefore alleges that the Bank claims an adverse interest in the property, and is therefore a proper party to this proceeding.

The petition closes with a prayer that the Trustee be ordered to surrender the 8,933 barrels of whisky and spirits to Schenley.

### 3. The Trustee's Answer.

On October 18, 1949, the Trustee and the Bank filed separate answers to the reclamation petition.

The Trustee admits most of the allegations of the petition, but he denies that the barrels in question belong to Schenley. He admits that the barrels are covered by warehouse receipts issued by Hedgeside to Schenley, but alleges that the receipts are void as against Hedge-

side's unsecured creditors, in that at the time the receipts were issued, the barrels, which are described in an exhibit attached to the reclamation petition were, and are now, Hedgeside's property, "and there was no transfer accompanied by any delivery or change of possession" from Hedgeside to Schenley, as required by Section 3440 of the Civil Code of California, infra, hereinafter referred to simply as "Section 3440".

The prayer asks that the legal title to the whisky and spirits be adjudicated in the Trustee, clear of any liens or claims of Schenley or the Bank. Though in an earlier part of his answer the Trustee denies that he has possession of the whisky and the grain spirits, in his prayer he admits it.

#### 4. The Bank's Answer.

Like the Trustee, the Bank denies that the barrels and their contents belong to Schenley, and alleges that any issuance by Hedgeside of the warehouse receipts on barrels of whisky mentioned in the aforesaid Schenley exhibit is void, as such receipts are subsequent to receipts issued by Hedgeside to the Bank, to secure repayment of money advances made by the Bank to Hedgeside. It is further stated that the warehouse receipts mentioned in the Schenley exhibit, together with those issued to Schenley's predecessors in title, are void as against Hedgeside's unsecured creditors, in that at the time the receipts were issued the barrels purported to be transferred by them were the property of Hedgeside and there was no delivery followed by any actual and/or continued change of possession.

The answer admits that the Bank claims an interest in the 8,933 barrels of whisky and spirits. It alleges that on certain specified dates the Bank lent Hedgeside "in good faith" certain sums of money, and received as security a pledge of whisky and spirits covered by warehouse receipts, as per a table incorporated in the answer. The table lists 2,859 barrels of whisky, valued at $99,-703, and 574 barrels of spirits, valued at $18,130. It is further alleged that

no part of these amounts has been repaid.

Unlike the Trustee, the Bank prays simply that Schenley "take nothing by its petition for reclamation."

#### 5. The Referee's Findings and Conclusions.

On January 10, 1952, the Referee issued an Order, Findings of Fact, and Conclusions of Law. What follows is a summary of that document.

The 8,933 barrels of whisky and spirits were purchased for value by Schenley from the respective owners thereof as set forth below. The owners intended to transfer the ownership and legal title to Schenley in exchange for the purchase price that they received. At the time of the filing of the petition in bankruptcy the 8,933 barrels, stored in bond in No. 2, were covered by warehouse receipts issued by Hedgeside to Schenley and now held by the latter.

Schenley's purchases were made in the following manner:

(a) Schenley purchased a total of 4,-815 barrels of spirits from Hedgeside, as follows:

Beginning in March, 1947, Schenley bought 1,293 barrels pursuant to a production contract for grain spirits, dated September 17, 1945. Beginning in October, 1947, Schenley purchased 3,191 barrels pursuant to a production contract dated October 13, 1947. All of these 1,-293 and 3,191 barrels were inspected and accepted by a representative of Schenley at Hedgeside as produced. The spirits were placed into barrels furnished by Schenley, and were then immediately stored in No. 2, except as hereinafter noted. Warehouse receipts covering the merchandise were issued by Hedgeside to Schenley, and are still held by the latter. The spirits covered by warehouse receipts Nos. 3665–B, 3669–B, and 3670–B were originally stored in Internal Revenue Bonded Warehouse No. 111, hereinafter referred to as "No. 111", of Franciscan, at Yountville, California, and were thereafter transferred in bond to No. 2.

Also pursuant to the contract of October 13, 1947, in November, 1947, Schenley purchased from Hedgeside 331 barrels of "on hand" spirits—part of which lot was in fact whisky but which has been treated by the parties throughout as grain spirits. Of the receipts now held by Schenley covering these 331 barrels, receipts Nos. 3511–B and 3512–B were issued by Hedgeside to Schenley at the time of the sale and the spirits covered thereby were then stored in bond in No. 2, whereas the spirits now covered by receipts Nos. 3671–B and 3673–B were at the time of the sale stored in bond in No. 111, and thereafter transferred in bond to No. 2.

(b) Schenley purchased a total of 1,359 barrels of grain spirits from Franciscan. In March and April, 1947, pursuant to a production contract for grain spirits between Stone, d. b. a. as Franciscan, and Schenley, dated November 1, 1945, assigned by Stone to Franciscan, Schenley purchased 459 barrels of spirits from Franciscan. Concurrently with the production and sale of these barrels, the spirits were inspected and accepted by a representative of Schenley at Franciscan as produced. The spirits were placed into barrels furnished by Schenley and were then stored in bond in No. 2. Warehouse receipts were issued by Hedgeside to Schenley covering those barrels, and are still held by Schenley.

Between December, 1947, and April, 1948, pursuant to a production contract for spirits between Franciscan and Schenley, dated October 13, 1947, Schenley purchased 900 barrels of the spirits from Franciscan. As before, the spirits were inspected, accepted, and barreled, and were then stored in bond in No. 111, being covered by receipts from Franciscan to Schenley. In November and December, 1948, the barrels were transferred in bond to No. 2. At that time the receipts for the barrels were issued to Schenley by Hedgeside, and are now held by the former.

(c) The rest of the 8,933 barrels of alcoholic products, totaling 2,759 barrels

of whisky, were purchased by Schenley from Heaven Hill, by oral contract made in December, 1947, and performed by the parties in January, 1948. Schenley is now the holder of warehouse receipts Nos. 3681B, 3682B, 3683B, and 3684B issued by Hedgeside to Schenley covering that whisky, now stored in bond in No. 2. These 2,759 barrels of whisky were originally produced by Franciscan at its distillery at Yountville, and were continuously stored since production in No. 2, subject to warehouse receipts issued from time to time to the respective owners by Hedgeside as follows:

Concurrently with its production between October, 1946, and January, 1947, 2,861 barrels of whisky—of which the said 2,759 are a part—were sold by Franciscan to Barnhill, a wholly-owned subsidiary of Glaser, pursuant to an oral agreement. The whisky was stored in bond in No. 2 as produced, and its sale to Barnhill was completed within a few days of production by delivery of Hedgeside receipts to Barnhill, in exchange for the agreed purchase price of $162,316.50, which was paid to Franciscan by Glaser. The parties intended to and did effect a transfer of title to this whisky at the time the receipts were delivered to Barnhill. The original purchase price was later reduced to $130,951.44 by a credit memorandum from Franciscan to Barnhill, as the result of a compromise.

For a proper understanding of the Bank's argument in connection with this credit memorandum, some elaboration is here necessary.

Marcus Glaser was president of Barnhill and president and general manager of Glaser, which holds all of the stock of Barnhill. He is also the vice president and one of the directors of Franciscan, which was owned 50 percent by Glaser.

Despite the fact that Marcus Glaser considered the original price of the whisky purchased from Franciscan to be the market value—$1 an original proof gallon—he forced Stone, the president and general manager of both Hedgeside and Franciscan, to issue a credit memoran-

dum to Barnhill amounting to $31,365.06. This credit was given on the strength of a certain "pre-incorporation agreement", whereby "no one was allowed to buy whiskey any cheaper than Barnhill." Marcus Glaser told Stone "if he (Stone) sold Hedgeside at * * * whatever the price * * *, then Barnhill was entitled to the same price".

Resuming our examination of the Referee's findings, we learn that Barnhill held all of the warehouse receipts covering these *2,861* barrels from January, 1947, the date of issue of the last receipt, until January 3, 1948, except for two barrels that were disposed of by Barnhill during the period. On January 3, 1948, Barnhill exchanged the receipts covering 2,759 (sic)[1] barrels for four negotiable warehouse receipts of Hedgeside—Nos. 384, 385, 386 and 387—and in accordance with an oral agreement of sale with Heaven Hill delivered these four negotiable receipts covering these *2,859* barrels to Heaven Hill for $131,-983.70.

Pursuant to the same oral agreement of sale between Heaven Hill and Schenley, Heaven Hill immediately delivered the four negotiable receipts covering the 2,859 barrels [2] to Schenley for $150,-314.77. Schenley held these receipts from January to December, 1948, except that during this period 100 barrels, covered by Receipt No. 384, were withdrawn by Schenley.[2] On December 22, 1948, Schenley exchanged the four negotiable receipts, covering 2,759 barrels of the whisky, for non-negotiable ones of Hedgeside—Nos. 3681B, 3682B, 3683B and 3684B—which receipts are still held by Schenley.

The Bank is the holder of duplicate warehouse receipts covering 3,333 barrels of the 8,933 barrels of whisky and spirits, the said duplicate receipts having been pledged by Hedgeside to secure loans made by the Bank to Hedgeside, as follows:

On January 4, 1949, Hedgeside pledged to the Bank as security for a loan its warehouse receipt No. 3689B, purporting to cover 574 barrels of the 3,191 barrels of grain spirits described in subdivision (a), supra. These 3,191 barrels had been purchased by Schenley from Hedgeside between October, 1947, and March, 1948. At the time of the pledge to the Bank, Schenley was the holder of valid Hedgeside warehouse receipts for the same 574 barrels of grain spirits, as follows:

| No. of Barrels and Serial Numbers | No. and Date of Issue of Schenley's Warehouse Receipts | | No. and Date of Issue of the Bank's Warehouse Receipts |
|---|---|---|---|
| 69 | 70228–296 | 3525B | (11–24–47) | |
| 27 | 70942–968 | 3538B | (Undated) | |
| 50 | 70969–71018 | 3539B | (12–8–47) | |
| 74 | 71069–71142 | 3541–B | (12–10–47) | 3689B |
| 96 | 71143–71238 | 3543–B | (12–11–47) | (1–5–49) |
| 85 | 71239–71323 | 3544B | (12–12–47) | |
| 150 | 71324–71473 | 3545B | (12–15–47) | |
| 23 | 71474–71496 | 3545B | (12–15–47) | |
| 574 | Barrels | | | |

1. This is evidently a clerical error in the Referee's Findings. The figure should be 2,859, since the 100 barrels of whisky covered by Receipt No. 384, mentioned hereinafter, were not withdrawn until some time during the period "from January to December, 1948". Nor does the figure "2,759" agree with the number of barrels, italicized here, shown elsewhere in the same paragraph. This same error has been carried over into the Receiver's certificate, page 10.

2. See Note 1.

All of the above warehouse receipts now held by Schenley for the 574 barrels of spirits were issued by Hedgeside and delivered by it to Schenley pursuant to the production contract described in sub-section (a), supra,[3] more than one year prior to the issue and pledge by Hedgeside of Receipt No. 3689B to the Bank. Receipt No. 3538B, undated, was delivered to Schenley on or about December 9, 1947. Schenley's warehouse receipts for these 574 barrels were delivered through the Bank, which acted as the collection agent for Hedgeside and delivered the warehouse receipts to Schenley in exchange for payment of Hedgeside drafts. The Bank had actual knowledge of the delivery to Schenley of the receipts covering the 574 barrels to Schenley.

At all times since the delivery to it of the warehouse receipts, Schenley has retained all the indicia of ownership of the 574 barrels, and Hedgeside was at no time clothed with the apparent ownership of that property, but held only the naked possession thereof in its capacity as a bonded warehouseman. Warehouse receipt No. 3689B was issued and pledged by Hedgeside to the Bank without Schenley's knowledge, authority, or consent, and the Bank in accepting the receipt relied solely on the mere possession of the property by Hedgeside, as the proprietor of a Government bonded warehouse. In accepting that receipt the Bank was not misled by any act or omission on the part of Schenley or of any one acting on its behalf.

Between June 17, 1947, and September 16, 1948, Hedgeside pledged to the Bank as security for loans to Hedgeside its warehouse receipts purporting to cover the said 2,859 barrels of whisky, described in subsection (c), supra. This whisky had been produced by Franciscan and sold by it to Barnhill as produced. The numbers and the dates of issue of the warehouse receipts pledged by Hedgeside to the Bank are as follows:

| No. | Date of Issue | No. of Barrels |
|---|---|---|
| 3469–B | 6–17–47 | 225 |
| 3470–B | 6–17–47 | 735 |
| 3472–B | 7–30–47 | 100 |
| 3474–B | 9–10–47 | 100 |
| 3475–B | 9–16–47 | 200 |
| 3476–B | 9–16–47 | 200 |
| 3477–B | 10–22–47 | 200 |
| 3548–B | 12–17–47 | 200 |
| 3552–B | 9–16–48 | 899 |
| | | 2,859 |

As set out in subsection (c), supra, at the time of the above purported pledges to the Bank, Schenley or Schenley's predecessors in title were the holders of valid warehouse receipts covering the said 2,-859 barrels of whisky, then stored in No. 2, the last receipt for said whisky having been issued to Barnhill more than four months before the first warehouse receipt for the same whisky was pledged to the Bank.

Schenley, or Schenley's predecessors in title—Heaven Hill and Barnhill—at all times since the delivery to them of their warehouse receipts covering the whisky, retained all the indicia of ownership of the liquor, and Hedgeside was at no time clothed with the apparent ownership of that property but held only the naked possession thereof as a bonded warehouseman. The warehouse receipts listed above held by the Bank were issued and pledged by Hedgeside to the Bank without the knowledge, authority, or consent of Franciscan, the original producer of the whisky, and without the knowledge, authority, or consent of the said subsequent purchasers of the liquor and holders of valid warehouse receipts therefor—Barnhill, Heaven Hill, and Schenley. In accepting its said warehouse receipts from Hedgeside, the Bank relied solely upon the mere possession of the whisky by Hedgeside as proprietor of a Government bonded warehouse. In accepting its warehouse receipts, the Bank was not misled or deceived by any act or omission on the part of Schenley

3. There are *two* "production contracts" mentioned in subsection (a). The Referee evidently has in mind the contract of October 13, 1947.

or its predecessors in title—Barnhill, Heaven Hill, and Franciscan—nor did it suffer detriment because of any act or omission of theirs.

At all times herein mentioned, up to the date of the filing of the involuntary petition in bankruptcy, Hedgeside's No. 2 held a permit to operate that warehouse duly issued by the United States, Alcohol Tax Unit Form 27–D, and at all of said times it held a "Distilled Spirits Manufacturer's License" and a "Public Warehouse" license, duly issued by the Board of Equalization of California. Hedgeside did not advertise for or solicit customers for the storing of spirits and whisky, and did not regularly store goods for the public generally, but in the regular course of its business Hedgeside stored in bond whisky and spirits produced in its own distillery, and whisky and spirits owned by a limited number of persons licensed to deal in bulk whisky and spirits, with whom Hedgeside did business. Hedgeside charged a reasonable rate in the regular course of business for such storage.

The principal place of business of Hedgeside and its No. 2, at all times herein mentioned, was at Napa, and at all of the said times copies of warehouse receipts issued by Hedgeside covering whisky and spirits stored in bond at No. 2 were kept at the said principal place of business and at the said warehouse.

At all times herein mentioned and during the year 1948, the Bank was not a creditor of Franciscan.

The Referee's conclusions of law were:

Schenley was and is a bona fide purchaser of the 8,933 barrels of whisky and spirits.

At the time Hedgeside pledged to the Bank the duplicate warehouse receipts for the 574 barrels of spirits, Hedgeside was not the owner of the spirits, nor did it have any right, title, or interest in them except as Schenley's bailee, Schenley being the owner of the spirits and the holder of valid warehouse receipts for them. The Bank has no interest whatsoever in the 574 barrels.

Hedgeside was at no time the owner of the 2,759 barrels of whisky, nor did it have any right to the whisky except as bailee; and Hedgeside's pledge to the Bank of duplicate receipts for the liquor carried no interest in it to the Bank. Prior to that pledge, the whisky, consisting of 2,859 barrels, had been sold by Franciscan, the producer and original owner, to Barnhill, which thereby became the owner of the whisky and which passed good title thereto to Heaven Hill, Schenley's predecessor in title. The Bank has no interest in any of the 8,933 barrels of whisky and spirits.

When alcoholic products manufactured by Franciscan were transferred into storage in Hedgeside's No. 2, concurrently with their sale, there was an immediate delivery and an actual and continued change of possession, within the meaning of Section 3440. (The Referee thrice erroneously cites the Code of Civil Procedure instead of the Civil Code).

At all times prior to the filing of the bankruptcy petition, Hedgeside was a warehouseman as defined in the California Uniform Warehouse Receipts Act, Civ.Code, § 1858.01 et seq., and at all times was lawfully engaged in the business of storing goods for profit. Hedgeside was authorized to and did issue valid warehouse receipts for goods so stored, including the receipts now held by Schenley for the 8,933 barrels. Hedgeside was not a "public utility" under the Public Utilities Act of California.

When Hedgeside issued its receipts as bailee for the 8,933 barrels stored in No. 2, the California Uniform Warehouse Receipts Act was the exclusive statute governing the transfer of title to that merchandise and the ownership thereof, for all purposes, and Section 3440 had and has no application thereto.

Hedgeside and Franciscan were the lawful proprietors of United States Bonded Warehouses No. 2 and No. 111, respectively. The transfer of all or part of the 8,933 barrels subjected the alcoholic products to the Internal Revenue Code of the United States and to the regulations promulgated thereunder; and

said transfers concurrently with the sale of said products were accompanied by an immediate delivery and an actual and continued change of possession within the meaning of Section 3440.

When Hedgside issued its warehouse receipts to Schenley for the 8,933 barrels, Hedgeside recognized and confirmed the conveyance to Schenley by the making of the storage contract contained in the receipts. As bailee for Schenley, Hedgeside was and is estopped from disputing Schenley's title as against Hedgeside.

Hedgeside, its estate, and the Trustee in Bankruptcy, have no right, title, or interest, either legal or equitable, in the 8,933 barrels or any part thereof. Schenley is the exclusive owner of the barrels and is entitled to the immediate possession thereof.

The Referee ordered that Schenley's reclamation petition be granted, and the Trustee was directed to deliver forthwith the 8,933 barrels to Schenley.

### 6. The Petition for Review.

On February 19, 1952, the Trustee and the Bank filed a Petition for Review of the Referee's Order. While the Petition ostensibly specifies a number of alleged errors in the Referee's "findings of fact", most of the so-called "findings" objected to are in reality conclusions of law. For example, the very first objection is directed to the Referee's finding that Schenley holds "warehouse receipts" for the 8,933 barrels of whisky and grain spirits. That finding is attacked on the ground that the purported "warehouse receipts" are not valid "since none of said documents were issued by a 'warehouseman' as defined by the applicable laws of the State of California, a requirement in order to avoid Section 3440 of the Civil Code". Since in the very same sentence the Trustee and the Bank admit that Schenley does in fact hold *"documents* purported on their face to be 'warehouse receipts' * * *"*, it is clear that the objection involves simply a question of law; i. e., are the admittedly-held documents valid?

Be that as it may, the Trustee and the Bank themselves in their briefs not only admit but insist that there are no conflicts in the evidence to be resolved by this Court. The very first words of their main brief are: "There is no dispute as to the material facts involved in this proceeding, * * *"; and the very first sentences of their closing brief are:

"At the outset we wish to make clear to the Court the fact that though there were many days of trial and therefore a long reporter's transcript there are *no disputed facts,* i. e., the Referee was not called upon to weigh and resolve conflicting evidence. The Referee arrived at the result he did by drawing conclusions of law from uncontradicted facts which we contend in our petition here were clearly erroneous and contrary to the established law of California. At the oral argument this Court requested each side to point out any facts disputed. We know of none. * * *"

This Court is inclined to agree with the Trustee and the Bank that there are no substantial issues of fact presented to it for determination.

That being the case, the only questions presented here are those of law. In such a situation, it is familiar doctrine that a reviewing court must exercise its independent judgment. "The presumption of correctness of the referee's findings is not extended by General Order XLVII, see 11 U.S.C.A. following section 53, to his conclusions of law." 8 Remington on Bankruptcy, 5th ed., section 3719, page 38. See also Weisstein Bros. & Survol v. Laugharn, 9 Cir., 1936, 84 F.2d 419, 420.

### 7. The Questions Presented.

On March 6, 1952, the Referee, in conformity with the provisions of 11 U.S.C.A. § 67, sub. a(8), filed his Certificate on the Petition for Review. The "Statement of Questions Presented", which forms part of the Certificate, reads in part as follows:

"The order being reviewed states that Schenley * * * is the owner and entitled to the immediate possession of 8,933 barrels of whiskey and grain spirits that were in the possession of the * * * bankrupt as of the date of bankruptcy. Schenley * * * holds documents purporting on their face to be warehouse receipts covering all of the property sought to be reclaimed. The Trustee in Bankruptcy contends that the transfer of said property to Schenley * * * is invalid as to creditors of said bankrupt, since the reclamation petitioner failed to take possession of said property as required by Section 3440 * * * The Trustee * * * also contends that the documents designated 'warehouse receipts' are insufficient in law to avoid the effect of said Section 3440, claiming that the issuer of said receipts was not a 'warehouseman' as defined by the Uniform Warehouse Receipts Act and the applicable California statutes, and, therefore, not within the exception of Section 3440.5 of said Civil Code. The * * * Bank * * * has set up a claim of title in itself as to a portion of said whiskey and spirits, due to a pledge made to it by the bankrupt and based on duplicate warehouse receipts."

Since diverse principles of law are applicable to the various lots of whisky and grain spirits that figure in this litigation, the different groups into which the 8,933 barrels of alcoholic products are divided will be considered separately.

The rights of the Bank, if any, will first be discussed.

8. Schenley's Title to the 574 Barrels of Spirits is Superior to That of the Bank.

As we have seen, on January 4, 1949, Hedgeside pledged to the Bank as security for a loan its warehouse receipt purporting to cover 574 barrels of the 3,191 barrels of grain spirits hereinbefore described. These 574 barrels had already been purchased by Schenley from Hedgeside between November 24, 1947, and December 15, 1947, according to Schenley's warehouse receipts. In other words, Hedgeside had nothing to pledge, so far as those barrels were concerned, when it delivered its purported "warehouse receipt" of January 5, 1949, to the Bank. The Bank admits that Schenley's warehouse receipts are prior in point of time.

■ It is well settled that the rule that an assignee acquires no better title than his assignor applies to a sale of non-negotiable warehouse receipts. In San Angelo Wine & Spirits Corporation v. South End Warehouse Company, 1936, 19 Cal.App.2d Supp. 749, 758, 61 P.2d 1235, 1239, it was said:

"In the case before us the plaintiff received an assignment of a non-negotiable warehouse receipt, which expressly set forth that the warehouseman claimed a lien for all lawful claims for money advanced as well as for charges and outlays of the kinds enumerated in section 27 of the Uniform [Warehouse Receipts] Act. The plaintiff, as assignee of Western Distillers Company, had no stronger right than that company itself; * * *."

■ Furthermore, the Referee found that the Bank acted "as collection agent for Hedgeside" in delivering the warehouse receipts to Schenley in exchange for the payment of the Hedgeside drafts. Thus the Bank had actual knowledge of the delivery to Schenley of the receipts covering the 574 barrels in question. Miss Elouise Jones, assistant to the supervisor of Schenley's "cashier, contract, and lease departments", gave detailed testimony regarding the manner in which she took the money to the Bank and picked up the warehouse receipts, the paid sight drafts, and the original invoices.

■ In their Petition for Review, however, the Trustee and the Bank strenuously object to the Referee's Finding that the Bank had actual knowledge of the Bank's delivery of the warehouse receipts to Schenley. They contend that "a bank, in functioning as a lending

**944**

agent, is not charged with notice of matter coming to the attention of an employee in the collection department, where there was no obligation or duty on said employee to transmit such notice to a proper officer or managing agent of the bank."

This precise argument, which happens to have been made by another national bank in this State in at least two cases during the last fifteen years, has been vigorously repudiated by the Supreme Court of California. In Sanders v. Magill, 1937, 9 Cal.2d 145, 153–154, 70 P.2d 159, 163, the Court said:

"Knowledge of an officer of a corporation within the scope of his duties is imputable to the corporation. (Many cases cited.) Appellant (bank) admits that the law is correctly stated in these authorities, and that certain of its officers knew at the time of the sale of said note that the water stock was pledged for the payment of the balance due on said promissory note and that it had never been sold to satisfy said balance or any part thereof. It contends, however, that while certain officers had this information, the officers *or agents* who negotiated the sale of said note to Magill had no such information, and that they dealt with Magill without any notice of the true status of said water stock. * * * Appellant's counsel concede that they have found no authority which supports this contention, but nevertheless assert that the position of appellant in this respect is both sound and reasonable. We are not inclined to agree with this statement. It is diametrically opposed to the well-established rule of law above stated that notice to the *agent* or officer of a corporation is imputable to the corporation itself. *Furthermore, such a rule, in our opinion, is fraught with danger and would open up avenues of fraud which would lead to incalculable hazards. It would permit a corporation, by not letting its right hand know what is in its left hand, to mislead and deceive those who are dealing with it in perfectly good faith. We are not prepared at this time to pioneer in this field of jurisprudence."* (Emphasis supplied.)

See also Vanciel v. Kumle, 1945, 26 Cal.2d 732, 734, 160 P.2d 802.

9. The "Heaven Hill" Whisky.

■ One of the most troublesome groups of merchandise to be here considered is the one comprising the 2,759 barrels of whisky purchased by Schenley from Heaven Hill. As the Bank and the Trustee themselves trace the chain of Schenley's title, "The whiskey so purchased (from Heaven Hill) was produced by Franciscan, then sold by it to Barnhill * * * which in turn sold to Heaven Hill, the predecessor in interest of Schenley". The intricate details of Schenley's and the Bank's conflicting claims have already been fully set forth in the summary of the Referee's findings, supra.

It will be remembered that the *last* receipt for the whisky was issued to Barnhill in January, 1947, *more than four months* before the *first* warehouse receipt for the same liquor was pledged to the Bank by Hedgeside, which *at no time* owned the whisky in question.

As the Bank points out, "this attempted disposition of the same goods to two different persons (sic) was the result of the actions of one Richard I. Stone, president and general manager of Hedgeside and Franciscan. Said Stone is now serving a sentence for theft in San Quentin."

In the case of In re Harbor Stores Corporation, D.C.N.Y.1939, 29 F.Supp. 749, 751, the Court said:

"It is undisputed that the warehouse receipts originally given to the Trust Company were fraudulently issued by the Insular Corporation. They stood for no actual deposits of cocoa beans in the warehouse by any of the Garcia companies or by the Trust Company *but were mere duplicating receipts purporting to*

*cover property clearly shown to belong to others. These fraudulent receipts were complete nullities as against the real owners of the goods.* (Cases cited.) And their subsequent exchange for warehouse receipts of the bankrupt in no way changed their character. (Case cited.) * * * Neither is there any basis for an estoppel against the real owners of the property. (Case cited.) *Nor is the good faith of the Trust Company at all material."* (Emphasis supplied.)

Nor did the issuance of the credit memorandum from Franciscan to Barnhill, reducing the original purchase price, supra, affect Barnhill's title to the whisky. There is no merit to the Bank's contention that "Since Barnhill never actually paid the *contracted* price, it never received title, and it consequently was unable to pass title to Heaven Hill, or Heaven Hill to pass title to Schenley."

The Referee found that after the original purchase price was paid, as a result of a compromise the figure was reduced and a credit memorandum was issued by Franciscan to Barnhill. When the seller makes a partial refund, a different legal situation is created from that which is present when the seller has not been paid at all.

■ Furthermore, unless the contract so specifies, payment does not affect the passage of title. Section 1739 of the Civil Code of California reads in part as follows:

"*Rules for ascertaining intention.* Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"*Rule 1. (Goods in deliverable state.)* Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

* * * * * *

"*Rule 4. (Appropriation of unascertained goods.)* (1) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer. Such assent may be expressed or implied and may be given either before or after the appropriation is made."

See also Otis v. Overland Terminal Warehouse Company, 1936, 18 Cal.App. 2d 157, 161, 63 P.2d 831, hearing denied by the Supreme Court of California, 1937.

■ Similarly, where there is a sale by invoice, draft, and warehouse receipts, title passes when there is "an acceptance and payment of the draft". Henderson v. E. Lauer & Sons, 1919, 40 Cal.App. 696, 698, 181 P. 811, 812; Alonso v. Badger, 1943, 58 Cal.App.2d 752, 758, 138 P.2d 24, hearing denied by the State Supreme Court, 1943.

With particular reference to warehouse receipts, we find the rule thus stated in 55 A.L.R. 1116:

"As in case of a bill of lading, a warehouse receipt is, in ordinary commercial transactions, regarded as the symbolical representation of the property, and its transfer and delivery are upheld as a valid transfer of the legal title to the property represented thereby."

The Bank insists that because of the "proven ability" of Glaser "to force the price downwards by making claims against Stone, no sums sent Franciscan by Barnhill can be regarded as turned over for Franciscan's unfettered control". If we give the maximum weight to this argument—which, as has been

stated, this Court does not consider valid—the Bank's position is not improved. Barnhill's title, at the very worst, was only *voidable* by Franciscan because of Glaser's insistence that Franciscan grant it a credit.

But Franciscan made no effort to avoid the sale to Barnhill before the latter sold the whisky to Heaven Hill. Therefore, even according to the Bank's theory, Barnhill and its successors in interest acquired a good title.

Section 1744 of the California Civil Code reads as follows:

> "*Sale by one having a voidable title.* Where the seller of goods has a voidable title thereto, but his title has not been avoided at the time of the sale, the buyer acquires a good title to the goods, provided he buys them in good faith, for value, and without notice of the seller's defect of title."

See also Keegan v. Kaufman Bros., 1945, 68 Cal.App.2d 197, 202, 156 P.2d 261.

■ The Bank complains that "during the period that Stone was borrowing from the Bank by pledging the warehouse receipts now held by the Bank and covering the Heaven Hill whiskey, Marcus Glaser, president of Barnhill, knew that Stone had been borrowing through Hedgeside representing that Hedgeside owned Franciscan-produced liquor." It is further urged that "Nothing was done by Marcus Glaser or Franciscan other than to bill Hedgeside in order to protect Glaser, and despite Marcus Glaser's knowledge of Stone's fraud in this connection, Marcus Glaser neither notified the Bank nor acted to replace the Franciscan management," etc.

As we have seen, however, the Referee specifically found that the warehouse receipts held by the Bank were pledged by Hedgeside without the knowledge of Franciscan or the successive purchasers of the whisky—Barnhill, Heaven Hill, and Schenley; that the Bank, in accepting the receipts from Hedgeside, relied solely on the mere possession of the whisky by Hedgeside as proprietor of a Government bonded warehouse; and that in accepting the receipts, the Bank "was not misled or deceived by and did not suffer detriment because of any act or omission on the part of (Schenley) or of (Schenley's) predecessors in title, Barnhill * * *, Heaven Hill * * *, and Franciscan * * *."

The above is a finding of *fact*; and both the Bank and the Trustee have told us emphatically that "there are no *disputed facts*".

To labor the question of Schenley's blamelessness in the matter of Hedgeside's pledge to the Bank would therefore be a work of supererogation.

### 10. The Mountain View Spirits.

■ In 1947–1948, Schenley purchased from Franciscan 900 barrels of grain spirits produced at Mountain View. These barrels were first stored at No. 111, but in the latter part of 1948 were transferred in bond to No. 2.

Both the Bank and the Trustee attack this sale on the ground, inter alia, that the *postponement* in the transfer from No. 111 to No. 2 makes the transaction invalid, by virtue of Section 3440. At present, however, there is being considered only the Bank's status as creditor, to give it standing to make such a claim.

The pertinent part of the section follows:

> "Every transfer of personal property, other than a thing in action, or a ship or cargo at sea or in a foreign port, and every lien thereon, other than a mortgage, when allowed by law, and a contract of bottomry or respondentia, is conclusively presumed if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred, to be fraudulent, and therefore void, against those who are his creditors while

he remains in possession, and the successors in interest of such creditors, and against any persons on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or encumbrancers in good faith subsequent to the transfer; * * *."

Section 3440.5 of the Civil Code is as follows:

"Section 3440 of this code shall not apply to goods in a warehouse where a warehouse receipt has been issued therefor by a warehouseman as defined in the Warehouse Receipts Act, and a copy of such receipt is kept at the principal place of business of the warehouseman and at the warehouse in which said goods are stored. Such copy shall be open to inspection upon written order of the owner or lawful holder of such receipt."

Aside from the point that a transfer into bond is a sufficient change of possession, which will be discussed infra, it may be observed that only a creditor of *Franciscan* during the period between December, 1947, and December, 1948—when Franciscan was in possession of the spirits—could, under Section 3440, challenge the sale to Schenley. The only evidence put in by the Bank on this phase of the case is to the effect that *as of the time of the trial*, October, 1950, Franciscan owed the Bank $3,929.54. That is a far cry from Franciscan's position as debtor "while * * * in possession" of the spirits.

To establish itself as Franciscan's creditor, however, the Bank invokes the provision of Section 3439.01 of the Civil Code, which reads in part as follows:

" 'Creditor' is a person having any claim, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent."

The Bank puts forth four elaborate theories under which it contends it has a "contingent" claim against Franciscan "running back as early as 1948". This claim, it is argued, is sufficient to give

the Bank the status of "creditor" within the ambit of Section 3439.01, supra.

The Bank's finespun and farfetched reasoning can best be expressed in its own words:

" * * * Stone, by virtue of the pre-incorporation agreement and the manner in which the other directors permitted him to operate Franciscan, was enabled to finance Franciscan as he chose. Commencing in 1946 Stone followed a practice of using Hedgeside as a conduit for Franciscan's borrowing. In other words, Stone ostensibly borrowed for Hedgeside, but actually gave the money to Franciscan. Similarly, Stone represented to the Bank that Hedgeside owned the security pledged, whereas actually Franciscan owned the security. Marcus Glaser knew of this practice as early as July, 1947. Nevertheless, the only action taken was to ratify Stone's conduct by memorandum billing by Franciscan against Hedgeside (in order to protect Glaser). The effect of this course of conduct was to make Franciscan liable to the Bank on the notes executed with respect to the so-called 'Heaven Hill purchase' as an undisclosed principal."

Out of this statement of fact, the Bank spins four "causes of action", based upon (a) contract, (b) deceit, (c) negligence, and (d) constructive trust. In connection with the theory of "negligence", the Bank tells us that it is asserting Franciscan's "own" negligence, "not any theory of respondeat superior". As to the constructive trust, the Bank says:

"The books and records of Franciscan show that large sums were received by Hedgeside during the period that Hedgeside was the ostensible borrower from the Bank in connection with warehouse receipts now held by the Bank. A fair inference may be drawn from the evidence that the money Hedgeside turned over to Franciscan came from the Bank, which makes Franciscan a

constructive trustee for the Bank for sums so received."

It is difficult to see how these collateral and complicated "causes of action" against Franciscan can spell out a creditor-debtor relation between the Bank and Franciscan to the prejudice of Schenley, which in good faith paid for the spirits in question and received warehouse receipts therefor.

The Referee found *as a fact* that "during the year 1948 Anglo Bank was not a creditor of Franciscan * * *" This Court believes that finding to be correct.

### 11. The Alter Ego Arguments.

Next, let us examine the claims of the Trustee.

To attack Franciscan's sales to Schenley by invoking Section 3440, the Trustee must establish himself as a creditor of *Franciscan*. It is insisted that, unlike the Bank, the Trustee bottoms his claim to a status of creditor of Franciscan upon "the alter-ego relationship between Hedgeside and Franciscan". The Trustee further maintains that " 'alter-ego' applies *solely* to the question of whether or not the Trustee has creditor status; it has nothing whatsoever to do with the entirely separate and distinct problem of whether or not a change of possession from Franciscan to Hedgeside satisfied Section 3440, which is solely a question of statutory construction".

This Court believes that the Trustee is here endeavoring to make a doctrinaire distinction between tweedledum and tweedledee. In any event, the Trustee's position will not be prejudiced if the two theories are considered together.

It is contended that "for all practical purposes the two corporations were merely separate names for the one business enterprise of their common president", Stone.

There were purchased by Schenley from Franciscan or its successors in title a total of 4,118 barrels of whisky and grain spirits, as follows:

(1) The Heaven Hill whisky, consisting of 2,759 barrels; chain of title: Franciscan to Barnhill to Heaven Hill to Schenley

(2) Grain spirits, 459 barrels, purchased by Schenley from Franciscan via Stone

(3) Grain spirits, 900 barrels, purchased by Schenley direct from Franciscan.

Of these three lots of merchandise, only No. 3 was not immediately stored in Warehouse No. 2. This third lot of 900 barrels was warehoused in No. 111 from various dates between December, 1947, and April, 1948, until November and December, 1948, when it was transferred in bond to No. 2.

Schenley objects that the "alter ego" argument constitutes an "affirmative defense" and therefore should have been specifically pleaded. In the Court's view of the case, however, it is not necessary to consider this highly technical contention, since the rights of the parties can be determined on a far sounder basis.

It may be assumed, then, for the sake of the argument, that the Trustee is in a pleading position to urge the alter ego theory.

It is well settled in California and elsewhere that "before the acts and obligations of a corporation may be recognized as those of a particular person under the *alter ego* doctrine, it must be shown that an adherence to the corporate entity under the particular circumstances would sanction a fraud or promote injustice." Wiseman v. Sierra Highland Mining Company, 1941, 17 Cal.2d 690, 698, 111 P.2d 646, 651.

The correct and salutary rule was thus succinctly stated in the case of In re New York Title & Mortgage Co., 1939, 172 Misc. 73, 14 N.Y.S.2d 570, 571, unanimously affirmed, 1939, 258 App.Div. 883, 17 N.Y.S.2d 224, appeal denied, 1940, 282 N.Y. 810, 27 N.E.2d 819:

"The corporate veil may at times be pierced to do equity and justice,

but never to accomplish the reverse." [4]

█ Schenley bought and paid for the merchandise in question. A finespun theory of alter ego should not deprive it of its purchase.

12. The Trustee, as the Representative of Hedgeside, Cannot Attack The Delayed Transfer of the 900 Mountain View Barrels.

There has already been discussed the Bank's attack upon Schenley's purchase of the 900 barrels of grain spirits produced at Mountain View. That attack was based upon the ground, inter alia, that the postponement in the transfer from No. 111 to No. 2 makes the transaction invalid.

Next to be considered is the Trustee's assault upon the same purchase, as a representative of Hedgeside, which is a creditor of Franciscan.

█ Under 11 U.S.C.A. § 110, sub. e, the Trustee may avoid any transfer by the bankrupt which any creditor of the *bankrupt* might have avoided. In this instance, however, the "creditor" is not a creditor of the bankrupt, but the bankrupt itself.

But, as the Trustee points out, the Trustee represents not only the bankrupt's creditors, but the *bankrupt* itself. It is in this latter capacity that the Trustee seeks to avoid the sale of the 900 barrels of spirits by Franciscan to Schenley.

█ The Referee concluded, as a matter of law, that Hedgeside, when it "issued its warehouse receipts for all or part of the said 8,933 barrels of whiskey and spirits, * * * recognized the conveyance to (Schenley) of said goods and confirmed said conveyance by the making of the storage contract contained in said warehouse receipts, and Hedgeside as bailee for (Schenley) was and is estopped from disputing (Schenley's) title to said goods as against Hedgeside".

Although the Trustee and the Bank, in their petition for review filed in this Court, vigorously attack most of the conclusions of law announced by the Referee, they leave unassailed the one dealing with Hedgeside's estoppel as bailee.

From this somewhat conspicuous hiatus, Schenley argues, probably correctly, that the Trustee has abandoned the point. Nevertheless, for the sake of completeness, this Court will consider it briefly.

As we have seen, the 900 barrels were transferred from Franciscan's No. 111 to Hedgeside No. 2 in November and December, 1948. At that time, according to the Referee's Findings, "the warehouse receipts for said barrels now held by (Schenley) were issued to (Schenley) by Hedgeside".

In December, 1948, then, Hedgeside became Schenley's bailee for the barrels in question. It is hornbook law that, as such bailee, Hedgeside cannot dispute Schenley's title to the spirits.

In 56 Am.Jur., Warehouses, section 27, pages 333–334, the rule is thus stated:

"In accordance with the well-settled general rule that a bailee is estopped to deny his bailor's title, a warehouseman with whom goods have been deposited is estopped, in the absence of the intervention of a paramount title, from disputing the

4. See also Hollywood Cleaning & Pressing Co. v. Hollywood Laundry Service, 1932, 217 Cal. 124, 130, 17 P.2d 709; Dos Pueblos Ranch & Improvement Co. v. Ellis, 1937, 8 Cal.2d 617, 621, 67 P.2d 340; Schmitt v. Northern Counties Land & Cattle Co., 1930, 108 Cal.App. 688, 691, 292 P. 173; Davis v. Perry, 1932, 120 Cal.App. 670, 674–675, 8 P.2d 514; In re Estate of Greenwald, 1937, 19 C.A.2d 291, 295, 65 P.2d 70, hearing denied by the State Supreme Court, 1937; Loughran v. Reynolds, 1942, 53 Cal.App.2d 250, 252–253, 127 P.2d 586, petition for hearing by the State Supreme Court denied, 1942; Campbell v. Birch, 1942, 53 Cal.App.2d 399, 406, 128 P.2d 120, petition for a hearing by the State Supreme Court denied, 1942; Spear v. H. V. Greene, Co., 1923, 246 Mass. 259, 140 N.E. 795, 798; In re Lawyers Mortgage Co., 1939, 173 Misc. 938, 15 N.Y.S.2d 239, 244.

title of the depositor. Under this doctrine, a warehouseman may not set up a title another does not assert, for the purpose of appropriating the stored goods to his own use."

See also 6 Am.Jur., Bailments, section 96 et seq., page 245 et seq.

The same doctrine has been embodied in the Warehouse Receipts Act of California, Act No. 9059, Deering's California General Laws, vol. 3, p. 3419.* Section 16 reads as follows:

> "*Title of warehouseman.* No title or right to the possession of the goods, on the part of the warehouseman, unless such title or right is derived directly or indirectly from a transfer made by the depositor at the time of or subsequent to the deposit for storage, or from the warehouseman's lien, shall excuse the warehouseman from liability for refusing to deliver the goods according to the terms of the receipt."

In 12 Cal.Jur., Fraudulent Conveyances, section 22, page 980, it is said:

> "A creditor may waive his right to avoid a fraudulent conveyance. Likewise his conduct may raise an estoppel as to him. Consequently, where the creditor recognizes the conveyance or makes any statement or *agreement* confirming it, upon the faith of which the grantee acts as he would not otherwise—such as expending money on the property—the creditor will be estopped to deny the validity of the conveyance." (Emphasis supplied.)

Since Hedgeside would have been estopped from questioning Schenley's title, the Trustee, as a representative of Hedgeside, is likewise estopped from doing so. In 4 Remington on Bankruptcy, 5th ed., section 1412, page 100, the rule is thus stated:

> "The Trustee takes title to all property which passes to him by operation of law under subdivision (a), section 70, 11 U.S.C.A., section 110, subject to all equities existing against the bankrupt at the time of the filing of the petition. He gets no more and no less than the bankrupt was entitled to at the time of the filing of the petition. It has been said that he stands in the shoes of the bankrupt."

For the above reasons, the Trustee is not in a position to attack the delayed transfer of the 900 barrels of Mountain View grain spirits from No. 111 to No. 2.

13. "The Real Basic Issue".

Although the parties have filed with the Referee and with this Court briefs dealing with many legal aspects of this case, and aggregating 263 pages in length, the Trustee and the Bank, in their closing memorandum, solemnly assert:

> "The real basic issue in this case is whether or not Schenley's failure to transfer possession of the barrels of whiskey and spirits purchased rendered the transactions void under Section 3440. This issue is involved in the case of each of the 8,933 barrels."

While this seems to be something of an over-simplification, it is undoubtedly true that the most important problem in this complicated litigation is the impact, if any, of that oft-invoked section upon the ultimate rights of the parties. Indeed, it is only by etching out the ancillary matters just discussed that one can bring out Section 3440 into proper relief.

(a) Section 3440 No Longer Governs In a Case of This Type.

The Court of Appeals for this Circuit has held that the California Warehouse Receipts Act, supra, has repealed Section 3440 insofar as it might otherwise apply to warehoused goods. This ruling of our Appellate Court is found in the case of Heffron v. Bank of America National Trust and Savings Association, 9 Cir., 1940, 113 F.2d 239, 242–243, 133 A.L.R. 203. In that case, the court said:

---

\* Now Civ.Code, § 1858.25.

"Indeed, the general scheme of the Warehouse Receipts Act to achieve uniformity, and to effect the secure and ready use of warehouse receipts as instruments of credit, is inconsistent with the notion that the business world must look to something other than the observance of the definite and comprehensive terms of the act itself. Compare Jewett v. City Transfer & Storage Co., 128 Cal.App. 556, 18 P.2d 351.

"We conclude that the Warehouse Receipts Act repealed section 3440 so far as the latter might otherwise apply to warehoused goods.

"The enactment in 1939 of § 3440.-5 of the Civil Code may fairly be considered as a move to clarify existing law or to remove doubts of the nature prompting the present litigation."

Our Court of Appeals has steadfastly adhered to the doctrine announced in the Heffron case, supra. In Sampsell v. Lawrence Warehouse Co., 9 Cir., 1948, 167 F.2d 885, 886, certiorari denied, 1948, 335 U.S. 820–821, 69 S.Ct. 42, 93 L.Ed. 375, the Court quoted from the Heffron decision with approval, and also gave an extensive excerpt from Commercial National Bank of New Orleans v. Canal-Louisiana Bank & Trust Co., 1916, 239 U.S. 520, 528–529, 36 S.Ct. 194, 197, 60 L.Ed. 417. In that case the Supreme Court said:

"It is apparent that if these uniform acts are construed in the several states adopting them according to former local views upon analogous subjects, we shall miss the desired uniformity, and we shall erect upon the foundation of uniform language separate legal structures as distinct as were the former varying laws." [5]

(b) Hedgeside Stored Goods "For Profit".

It is necessary, therefore, to consider the rights of the parties in the light of the California Warehouse Receipts Act. For a proper appraisal of those rights, however, we must first glance at some Federal statutory provisions governing distilleries.

The products of a distillery, when "removed from the place where they were distilled and not deposited in bonded warehouse as required by law" are subject to a tax amounting to several times their value and collectible "immediately". 26 U.S.C.A. § 2800(b) (2). Many distillers operate an Internal Revenue Bonded Warehouse, where the merchandise can be stored for eight years without payment of a tax. See 26 U.S.C.A. §§ 2872 and 2879(b).

As we have seen, the Referee found that in the regular course of its business Hedgeside stored in bond whisky and spirits produced in its own distillery, and whisky and spirits owned by a limited number of persons with whom Hedgeside did business. Hedgeside charged a reasonable rate for such storage. Copies of its warehouse receipts were kept at Hedgeside's principal place of business and at its Warehouse, referred to herein as No. 2, both at Napa.

Furthermore, the Referee found as a fact that Hedgeside held State and Federal permits and licenses to engage in business as a bonded warehouse, to manufacture distilled spirits, and to conduct a "public warehouse".

Under these Findings, Hedgeside was a warehouseman under the Uniform Warehouse Receipts Act, according to Schenley's argument. The Trustee and the Bank deny this, attacking Hedgeside's status as a warehouseman on two grounds.

---

5. See also Barry v. Lawrence Warehouse Co., 9 Cir., 1951, 190 F.2d 433, 437–438; Bradley v. St. Louis Terminal Warehouse Company, 8 Cir., 1951, 189 F.2d 818, 823; Jewett v. City Transfer & Storage Co., 1933, 128 Cal.App. 556, 562, 18 P.2d 351, hearing denied by the State Supreme Court; Sampsell v. Security-First Nat. Bank of Los Angeles, 1949, 92 Cal.App.2d 648, 651–652, 207 P.2d 1088, petition for a hearing denied by the State Supreme Court, 1949, 67 C.J. 448, Warehousemen and Safe Depositaries, section 8.

Section 58 of the Warehouse Receipts Act of California, supra,** defines "Warehouseman" as "a person lawfully engaged in the business of storing goods for profit".

The record shows that Hedgeside charged 10 cents per barrel per month for storage. In addition, there was a 25-cent "handling charge" for taking each barrel "off of a truck or other conveyance that brought it there, taking it into the warehouse," etc. A similar 25-cent fee was collected when the barrel was taken out. There is also testimony that "when the rate of 10 cents per month" was fixed, there was no estimate made of whether it would render a profit "on the operation".

From such a showing, it is argued that Hedgeside was not a "warehouseman" as defined by California statute, since it "was not engaged in the business of storing for profit".

In support of his position, the Trustee cites two California decisions involving facts far different from those before this Court, and containing language inferentially adverse to the Trustee's contention.

One case is that of Sinsheimer v. Whitely, 1896, 111 Cal. 378, 380, 43 P. 1109, 1110, decided long before the passage of the California Warehouse Receipts Act. There no storage whatever was charged. In the course of its opinion, however, the Court used the following language:

"A warehouse receipt has been defined to be a written contract between the owner of the goods and the warehouseman, the latter to store the goods, and the former to pay for that service. Hale v. Milwaukee Dock Co., 29 Wis. [482], 488 [9 Am. Rep. 603]. * * * But it is said that the tickets were the only vouchers issued by the defendant company, and hence must be treated as warehouse receipts. Rather, it seems to us, that circumstance tends to show that said company was not a 'warehouseman' at all in the sense which the law attributes to that term,—an inference corroborated by the fact that it makes no charge for storage. It is only persons who pursue the calling of warehousemen— that is, receive and store goods in a warehouse as a business for profit —that have power to issue a technical warehouse receipt, the transfer which is a good delivery of the goods represented by it. Shepardson v. Cary, 29 Wis. [34], 42; Bucher v. Commonwealth, 103 Pa. [528], 534; Edwards on Bailm. § 332." (Emphasis supplied.)

From the foregoing, it will be seen that the expressions "to pay for that service", "charge for storage", and "for profit" are used interchangeably.

The other case, Harry Hall & Co. v. Consolidated Packing Company, 1942, 55 Cal.App.2d 651, 654, 131 P.2d 859, 861, likewise was one in which no storage was charged. As to the point now under discussion, the Court merely said, citing the Sinsheimer case, supra:

"In the present case defendant was not a public or a private 'warehouseman' * * *, nor was it to receive compensation for the storage."

It is difficult to see how the Trustee or the Bank can derive comfort from either of these California cases. They simply are not in point.

In Fidelity & Deposit Co. v. State of Montana, 9 Cir., 1937, 92 F.2d 693, 696, the Court said:

"That Chatterton & Son was a public warehouseman within the general meaning of the term is not questioned. A storage and handling charge was regularly exacted from all those using the warehouse facilities and negotiable warehouse receipts were uniformly issued. 67 C. J. 443."

 Section 57 of the Warehouse Receipts Act †—a section that seems to have escaped the notice of counsel—provides:

---

** Now Civ.Code, § 1858.04.

† Now Civ.Code, § 1858.03.

*"Interpretation of act.* This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it." [6]

Since the "law of those states which enact it" includes not only state statutes but also judicial decisions interpreting those statutes, the opinions of state judges in other commonwealths will be helpful here.

In New Jersey Title Guarantee & Trust Co. v. Rector, 1910, 76 N.J.Eq. 587, 75 A. 931, 932-933, the New Jersey Court of Errors and Appeals—the highest in the State—construed this identical Section 58 as follows:

"Section 58 declares 'warehouseman' to mean a person lawfully engaged in the business of storing goods *for profit,* and the bill of complaint alleges that the complainant is conducting the business of running safe deposit vaults, and warehousing valuable goods and chattels *for hire,* which sufficiently describes 'warehouseman' as defined by the act, * * *." (Emphasis supplied.)

The Uniform Warehouse Receipts Law was construed by the same Court in New Jersey Manufacturers' Association Fire Insurance Company v. Galowitz, 1930, 106 N.J.L. 493, 150 A. 408, 409. There the Court remarked:

"The legal concept of the action comes within the general subject of bailee for hire. The automobiles were stored *at a price* in defendant's garage. The principle of liability is that of a warehouseman." (Emphasis supplied.)

In E. V. Webb & Co. v. Friedberg, 1925, 189 N.C. 166, 126 S.E. 508, 509, the Supreme Court of North Carolina implied that the mere fact that a receipt gives the "storage rates" indicates that the goods are stored "for profit". The Court said:

"If the concern is engaged in the business and goods are stored *for profit,* the statute applies. It matters not if the concern stores its own and also the goods of others (as was done by Hedgeside). The receipt issued terms itself 'warehouse receipt' and *shows on the face that the goods are stored for profit; it gives the 'storage rates.'* " (Emphasis supplied.)

This Court holds that Hedgeside was engaged in the business of storing goods for profit, within the meaning of the California Warehouse Receipts Act.

**(c) Copies of Schenley's Receipts Were Kept at No. 2, As Required By Section 3440.5.**

Section 3440.5 supra, provides that Section 3440 shall not apply where a copy of the warehouse receipt is kept "at the principal place of business of the warehouseman and at the warehouse in which said goods are stored." In the Heffron case, our Court of Appeals held that this section "may fairly be considered as a move to clarify existing law or to remove doubts of the nature prompting the present litigation". [113 F.2d 243.]

The Trustee and the Bank concede that copies of all receipts that Schenley now holds were kept at Hedgeside's "principal place of business". They deny, however, that copies were kept "at the warehouse in which said goods are stored".

The Referee found *as a fact* that at all times copies of warehouse receipts issued by Hedgeside, covering whisky and spirits stored in No. 2, "were kept at said principal place of business" *and* "at said warehouse".

Hedgeside had two warehouses that made up No. 2. The Hedgeside office and the storekeeper-gauger's office were in a third building. The receipts were made out in triplicate, and the receipt books were stored in a vault in "a little extra room off of the main office". The space between the building where the

---

6. See also the cases referred to in Subsection (a) of Section 13 of this opinion.

office is and "where the warehouse starts" is "a truck and a half".

Apparently because the copies of the warehouse receipts were not kept *in* the warehouse building *itself*, the Trustee argues that copies were not kept "at the warehouse".

This Court is not impressed with such hairsplitting. Section 3440.5 requires that "Such copy shall be open to inspection upon written order of the owner or lawful holder of such receipt." Obviously, a person presenting such an authorization would go to the office building— not to the warehouse structure itself, which Federal law requires shall be "kept securely locked, and shall at no time be unlocked or opened or remain open except in the presence of such storekeeper-gauger or other person who may be designated to act for him." 26 U.S. C.A. § 2872.

But perhaps "We must speak by the card, or equivocation will undo us." [7]

Fernald's "Connectives of English Speech," at page 55, has the following:

"*At* is less definite than *in*. *At* the church may mean *in*, or *near* the church."

The Court holds that copies of Schenley's warehouse receipts were kept *at* No. 2, as required by Section 3440.5.

14. Regardless of the Uniform Warehouse Receipts Act, Storage in A Government Bonded Warehouse Effects a Change of Possession Within the Purview of Section 3440.

■■■ Because of the Government's tight control over distilleries, it is well settled that storage of alcoholic products in an Internal Revenue Bonded Warehouse constitutes a sufficient change of possession under the Bulk Sales Law.

Not only, as we have seen, are distilled spirits immediately subject to tax, but Section 2872, supra, provides for the joint custody of the proprietor of the warehouse and a Government officer, called the "storekeeper-gauger".

Section 2873, as modified by Reorganization Plan No. 26 of 1950, prepared by the President of the United States pursuant to the provisions of the Reorganization Act [8] of 1949, 5 U.S.C.A. § 133z— 1 et seq., provides that "The establishment, construction, maintenance, and supervision of internal revenue bonded warehouses shall be under such regulations" as the Secretary of the Treasury shall prescribe.

Section 2879(a) requires that distillers of all spirits removed to an Internal Revenue Bonded Warehouse shall enter the same for deposit in such warehouse, under such regulations as the Secretary of the Treasury [9] shall prescribe.

Section 2915 contains detailed instructions regarding the keeping of the storekeeper gauger's warehouse book.

Referring to the Government's heavy hand upon distilleries, in Taney v. Penn National Bank of Reading, 3 Cir., 1911, 187 F. 689, 697, 698, 699, 700, 703, the Court said:

"The tax on whisky is remarkable and distinguished from other excise taxes, by the fact that it is in amount many times the cost of the whisky itself, the tax of $1.25 a gallon being about five times the ordinary value of the whisky at the still.[10] It is manifest that this extraordinary tax could not be collected on the whisky as it comes from the still, or when it is first put in barrels, without hardship to the distiller or owner so great as to discourage its manufacture or confine such manufacture to persons or corporations of great wealth. It was necessary, or at least very desirable in the interest of the public revenue, that reasonable opportunity should be given to the distiller, to allow the product of his distillery to become marketable by the ripening

---

7. Hamlet V i 142–143.

8. See note under 5 U.S.C.A. § 241.

9. See note 8, supra.

10. Under a 1951 amendment to 26 U.S.C.A. § 2800(a) (1), the tax was $10.50 on each proof gallon.

process alluded to, before he was called upon to pay the tax. * * *

* * * * * *

"* * * the warehouse is theoretically in the joint custody of the store-keeper and the proprietor, but, in fact, the control of the store-keeper is complete and practically exclusive. The lock is put on by the government and the key is in the store-keeper's possession. * * *

* * * * * *

"To all the world, but especially to those engaged in the business of distilling and of buying and selling whisky, it was apparent that the physical custody and control of the whisky here in question was not in the distiller and vendor, but in the revenue officers of the United States, and in neither case was the distiller capable of making physical delivery to his pledgee or vendee. All those doing business with these distillers, including creditors, were bound to take notice of this notorious physical fact and were put upon due inquiry, and had imposed upon them the duty of self-protection, as to the title of the goods so situated. * * *

* * * * * *

"The physical possession was not transferred, because it was out of the power of the vendor to transfer the same, without the payment of a tax many times the value of the goods sold, one of the very objects of the law providing for the government's custody of the whisky presumably being that the payment of the tax might be deferred for a number of years without interfering with the right to transfer the property therein. * * *

* * * * * *

"As the reason for the rule making fraudulent, as against creditors, transfers of personal property, unaccompanied by actual delivery, is based upon the policy of preventing the fictitious credit permitted by allowing possession to remain in the debtor, it is pertinent to remark, in re-

gard to a situation which, under the laws of the United States is, as we have said, sui generis, that, as the creditors of the Distilling Company had no access to the interior of the warehouse, they could not claim to have been misled to their injury. They cannot be deemed to have given credit upon the faith of whisky in a warehouse of which they had no means of ascertaining the contents."

The Taney case, supra, was affirmed by the Supreme Court, 1914, 232 U.S. 174, 34 S.Ct. 288, 58 L.Ed. 558.

In an effort to distinguish the Taney decision on the facts, the Trustee and the Bank repeatedly point out that "other warehouses were so close to Hedgeside that whiskey and spirits could be stored elsewhere within 72 hours, so that tax payments could be avoided", while that was not true in Taney.

Precisely such an argument, however, was repudiated in the Supreme Court's Taney decision. Mr. Justice (later Chief Justice) Hughes said, at pages 185–186, of 232 U.S., at page 290 of 34 S.Ct. of his opinion:

"It is said that the distiller need not use his own warehouse, but may place the goods in one of the general bonded warehouses established under the act of 1894 (28 Stat. at L. 564, 565, chap. 349). The appellee asserts that this would be impracticable; that no general bonded warehouse had been established in the collection district in question; that there are only twelve in the entire country, with a capacity that is extremely small in comparison with the output of the distilleries. *But, aside from this, the distillery warehouse is equally recognized by law; it is 'a bonded warehouse of the United States.' If it is a fit place for storage, the distiller is not obliged to remove the spirits elsewhere.* * * *

"The fundamental objection is that the custom, to which the entire trade *is adjusted, is* opposed to public policy. But we know of no

ground for thus condemning honest transactions which grow out of the recognized necessities of a lawful business. The case is not one where credit may be assumed to be given upon the faith of the ostensible ownership of goods in the debtor's possession. Everyone dealing with distillers is familiar with the established practice in accordance with which spirits are held in store, under governmental control, and are transferred by the delivery of such documents as we have here." (Emphasis supplied.)

The Bank and the Trustee insist that the Taney case can be distinguished on the ground that California law is different from Pennsylvania, and that the Supreme Court decided the case "under Pennsylvania law". In the excerpt just quoted, however, Mr. Justice Hughes was expounding, not state law, but a Federal statute relating to "a bonded warehouse of the United States."

Similarly, in Merchants' National Bank of Baltimore v. Roxbury Distilling Company, D.C.Md.1912, 196 F. 76, 101, the Court discounted the effect of the local law upon the problem now being discussed:

"But independent of the special enactment of Maryland with regard to distillery warehouses, I am in full accord with the special master in his conclusion that, *because of the peculiar situation of the distilled spirits stored in a bonded distillery warehouse,* there is by the transfer effected by the warehouse certificate as full a delivery of the goods as is commercially possible *under the special circumstances attending distilled spirits stored in the bonded distillery warehouses of the United States."* (Emphasis supplied.)[11]

11. See also Bache v. Hinde, 6 Cir., 1925, 6 F.2d 508, 510, note 3, certiorari denied J. S. Bache & Co. v. Hinde, 1925, 269 U.S. 581, 46 S.Ct. 106, 70 L.Ed. 423; Brown v. Cummins Distilleries Corp., D.C.Ky., 1944, 53 F.Supp. 659, 664; Wells Fargo Nevada Nat. Bank of San

### 15. Conclusion.

The Court holds that the 574 barrels of grain spirits purchased by Schenley and later pledged by Hedgeside to the Bank, belong to Schenley.

Schenley likewise has a superior title to the so-called "Heaven Hill whisky", produced by Franciscan, sold by it to Barnhill, by Barnhill to Heaven Hill, and by Heaven Hill to Schenley. The last receipt for this whisky was issued to Barnhill more than four months before the first warehouse receipt for it was pledged to the Bank by Hedgeside, which at no time owned the merchandise in question.

The 900 barrels of grain spirits purchased by Schenley from Franciscan, first stored at No. 111 and later transferred in bond to No. 2, belong to Schenley for the reason that a transfer into bond constitutes a sufficient change of possession. Furthermore, the Bank has not shown that it was a creditor of Franciscan during the time that these 900 barrels remained in Franciscan's warehouse, No. 111. Only a creditor of Franciscan while the latter remained in possession could, under any theory, attack the sale to Schenley.

Nor will the Trustee be permitted to establish that, under the alter ego theory, he is in reality also a creditor of Franciscan as well as of Hedgeside. The "corporate veil" may not be pierced to work an injustice.

As the representative of Hedgeside— Schenley's bailee with regard to the 900 barrels of Mountain View grain spirits —the Trustee cannot question the title of his bailor, on the ground of the so-called delayed transfer from No. 111 to No. 2.

Furthermore, Schenley has established that it comes within the ambit of the California Warehouse Receipts Act,

Francisco v. Haslett Warehouse Company, 1922, 60 Cal.App. 225, 228–229, 212 P. 647, petition for hearing in the State Supreme Court denied, 1923; Lederer v. Railway Terminal & Warehouse Co., 1931, 346 Ill. 140, 178 N.E. 394, 396, 77 A.L.R. 1497.

which our Court of Appeals repeatedly has declared has repealed Section 3440 "so far as the latter might otherwise apply to warehoused goods." [113 F.2d 243.]

Apart from all this, however, because of the Government's tight control over distillers, storage of alcoholic products in an Internal Revenue Bonded Warehouse constitutes a sufficient change of possession under the California Bulk Sales Act.

■ Finally, Schenley or Schenley's predecessors in interest acquired a title to all of the 8,933 barrels of whisky and spirits that was prior in point of time to that of the Bank. In the absence of determinative considerations to the contrary, Schenley should not be deprived of the fruits of this priority. The Court does not find such countervailing elements present here.

Under all the facts, which are undisputed, and under all the legal principles applicable to those facts, to deprive Schenley of what, in good faith, it bought and paid for, would be "rigour and not law".

The Referee's Findings of Fact and Conclusions of Law, except as hereinbefore noted, and his Order are approved and affirmed.