CARNAL v. W. B. THOMPSON & CO. ET AL.

January 19, 1931. Opinion and Decree.)
(February 16, 1931. Rehearing Granted.)
(March 23, 1931. Opinion and Decree on Rehearing.)
(April 27, 1931. Writs of Certiorari and Review Refused by Supreme Court.)

Milling, Godchaux, Saal & Milling, of New Orleans, attorneys for plaintiff, appellant.

McCloskey & Benedict, of New Orleans, attorneys for defendant, appellee.

HIGGINS, J. Plaintiff brings this suit against the late firm of W. B. Thompson & Company and its individual partners and the Hibernia Bank & Trust Company to obtain a judgment ordering the defendant to deliver to the plaintiff, as owner thereof, the possession of seventeen bales of cotton claimed to be illegally held by defendants, and, in the event that the said judgment be not complied with, that there be judgment in favor of the plaintiff and against the defendants, in solido, for the value of the cotton, namely $1,700, with legal interest thereon from judicial demand.

The petition alleges in substance that the plaintiff was a cotton farmer residing at Lecompte, Rapides parish, Louisiana; that during the years of 1926 and 1927 he shipped seventeen bales of cotton to Thompson & Company, a partnership domiciled in New Orleans and composed of W. B. Thompson and his sister, Mrs. Florence Thompson, with written instructions and under an agreement that Thompson & Company would not sell, or otherwise dispose of the cotton until ordered to do so by the plaintiff; that he never gave Thompson & Company instructions or authority to sell, or otherwise dispose of his cotton, but during August, 1928, when the firm of W. B. Thompson & Company had been dissolved by the death of W. B. Thompson, he was informed that the said partnership had stored his cotton and secured negotiable warehouse receipts for the same and had delivered and pledged these receipts to the Hibernia Bank & Trust Company as security for an indebtedness of the said firm to the bank and that, consequently, the partnership was unable to comply with plaintiff's order to deliver the cotton to him; that thereupon plaintiff made demand for delivery of the cotton upon the Hibernia Bank & Trust Company, which refused to comply therewith.

The petition further charged that Thompson & Company had no power, or ability, to convey title even to a purchaser in good faith and for value, either directly or by the warehouse receipts, and further that the said firm had no right, or authority, to dispose of his cotton, or to place it in a warehouse and secure receipts therefor that could be negotiated, and that, if such receipts were in fact negotiated, they were obtained and disposed of without the plaintiff's knowledge or acquiescence, in bad faith and in fraud of his rights, and no title was conveyed thereby; that it was generally known to all banking institutions in New Orleans, and particularly within the knowledge of the Hibernia Bank & Trust Company, that the sole business of Thompson & Company was that of cotton factor and commission merchant and that the business and the practice of the said firm was at no time that of buying, selling, or handling cotton for its own account, but handling only the cotton shipped to it by planters and farm-

ers; that the Hibernia Bank well knew, when Thompson & Company presented the said warehouse receipts, that the said cotton and receipts did not belong to the said firm, but to some customer of the said firm, said bank being fully informed and placed on notice and inquiry as to the origin of the said receipts; and that the Hibernia Bank was, therefore, a possessor in bad faith, and acquired no right, title or interest to the cotton or warehouse receipts.

The petition further avers that Thompson & Company pledged the said warehouse receipts to the said bank, which failed to exact of Thompson & Company the affidavit required by Act No. 72 of the legislature of Louisiana of 1876, as amended by Act No. 176 of 1902.

Exceptions of no cause of action were filed by the defendants and overruled, and two of the defendants answered as follows:

(1) The sole defense of Mrs. Florence Thompson Fulton was that she was not a member of the partnership of W. B. Thompson & Company.

(2) The defense of the Hibernia Bank was that it had accepted and secured, as collateral security for monies advanced to Thompson & Company, the negotiable warehouse receipts covering the cotton in good faith and for value in due course from W. B. Thompson & Company and that, consequently, its pledge should be upheld.

The firm of W. B. Thompson & Company interposed no defense whatever.

On the trial of the case on its merits the first time there was judgment in favor of the plaintiff, as prayed for, setting aside the alleged pledge of the Hibernia Bank and ordering the defendants to deliver the cotton to plaintiff, or to pay the value thereof. Mrs. Fulton and the bank filed motions for a new trial. A new trial was granted in favor of the bank, but refused with respect to Mrs. Fulton, and, therefore, the controversy as between plaintiff and defendants, Thompson & Company and Mrs. Fulton, is not before us, as neither of these defendants have appealed.

On the second trial between the plaintiff and the Hibernia Bank the issue was whether the pledge of the warehouse receipts was valid or invalid. There was judgment in favor of the bank upholding the validity of the pledge and dismissing plaintiff's suit as far as the defendant bank was concerned, and plaintiff has appealed from that judgment.

The pertinent facts of the case may be stated as follows:

Plaintiff is a young man living at Lecompte, Louisiana, and is rural mail carrier and operates a small farm. He had raised small crops of cotton and had been shipping several bales of cotton during the seasons of 1920, 1921, 1922 and 1923 to W. B. Thompson & Company at New Orleans. In the year of 1926 he shipped four bales and in 1927 he shipped thirteen bales. These seventeen bales are the ones over which the present controversy arose. On each occasion when the shipment was made on a straight bill of lading he wrote a letter to Thompson & Company containing positive instructions to hold the cotton until he gave them orders to sell it. He testifies that he did not know Mr. Thompson personally and had never been in his place of business in New Orleans, and believed that Thompson & Company owned its own warehouses and was storing his cotton there; that he did not authorize the storing of the cotton in a pub-

lic warehouse and the obtaining of nego- tiable warehouse receipts in Thompson & Company's name. The four bales of cot- ton of the crop of 1926 were received by Thompson & Company about October 15, 1926, and placed in a public warehouse and negotiable warehouse receipts ob- tained in its name. These receipts were pledged to the New Orleans Bank & Trust Company to secure an individual debt of Thompson & Company. In 1927 this com- pany paid its loan to the New Orleans Bank & Trust Company, which returned the warehouse receipts to it and there- upon, in December of 1927, these four re- ceipts were pledged to the Hibernia Bank as collateral security for an individual loan to Thompson & Company.

Plaintiff's crop of 1927 consisted of thir- teen bales of cotton and were shipped to Thompson & Company in September of 1927. This cotton was likewise stored in a public warehouse and negotiable ware- house receipts obtained in Thompson & Company's name and these receipts were pledged with the Hibernia Bank as securi- ty for its individual debts, or loans.

Plaintiff at no time received any loans or advances from Thompson & Company against the cotton, and only the small items of insurance and storage were due by plaintiff and were to be liquidated when the cotton was sold, in accordance with the custom obtaining in this market. All of the cotton was to be held by Thompson & Company until plaintiff in- structed that firm to sell it, and it is clear from the record that the plaintiff at no time, directly or indirectly, authorized Thompson & Company to sell or pledge the cotton to anyone.

The question for consideration is wheth- er or not the pledge of the cotton to the Hibernia Bank is valid or invalid. The bank claims that the pledge is valid be- cause it is a bona fide holder for value in due course of negotiable warehouse re- ceipts. The plaintiff contends that the pledge was null and void on the following grounds, to-wit: First, the Hibernia Bank & Trust Company was charged with notice and put upon inquiry that the cotton and the warehouse receipts therefor did not belong to Thompson & Company, but to the plaintiff or one of the customers of the said firm; second, that Thompson & Company did not have any title to the cotton or warehouse receipts and had no ability or authority to convey title to or otherwise dispose of the cotton of plaintiff, or to store it and secure negotiable ware- house receipts therefor, nor was posses- sion or custody of the said receipts en- trusted to Thompson & Company by the plaintiff; third, that the pledge of the ne- gotiable warehouse receipts to the bank is invalid because, at the time of taking the pledge, the bank failed to exact of Thompson & Company the affidavit re- quired by Act No. 72 of the General As- sembly of 1876, as amended by Act No. 176 of 1902.

We shall discuss and decide these issues seriatim.

Section 47 of Act No. 221 of 1908, known as the Uniform Negotiable Warehouse Re- ceipts Act, provides:

"When Negotiation not Impaired by Fraud, Mistake, or Duress—The Validity of the negotiation of a receipt is not im- paired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation or by the fact that the owner of the receipt was in- duced by fraud, mistake or duress to en- trust the possession or custody of the re- ceipt to such person, if the person to whom the receipt was negotiated, or a person to whom the receipt was subse- quently negotiated, paid value therefor,

without notice of the breach of duty, or fraud, mistake, or duress."

In the light of this section the person to whom a receipt has been negotiated takes nothing by the transfer, if he had notice of a breach of trust or duty on the part of the person making the negotiation.

Notice, in its accepted legal sense, means such information on the part of the person ·charged with notice as would put a prudent person on inquiry to ascertain the true or actual facts. See Words & Phrases, First, Second and Third Series, verbo "Notice."

Did the Hibernia Bank, when it received these warehouse receipts from Thompson & Company, have in its possession such facts and information as would have put a prudent person upon inquiry to ascertain whether or not a breach of duty, or trust, was being perpetrated by Thompson & Company in pledging the receipts?

The business of Thompson & Company was exclusively that of cotton factor and commission merchant. Their letterheads, billheads and other stationery announced that fact to the public and particularly to those who did business with it. This company had been doing business for years on a large scale with the Hibernia Bank and other banks in New Crleans. It was a large borrower from the banks. Its bills payable aggregated, at times, over three-quarters of a million dollars. This company's account with the Hibernia Bank, while a valuable one to the bank, was one which, because of the size of the loans involved, must have called for close scrutiny by the officers of the bank of the business and affairs of this firm. The main

security for its loans from the bank consisted of the pledge of negotiable warehouse receipts. The officials of the bank knew W. B. Thompson well and it appears that he enjoyed a high position in the civic and business affairs of the community, as well as being well regarded in financial circles for his honesty and fair dealing. But the bank, from time to time, required reports and statements of the firm's business, which were submitted to the bank and critically examined and analyzed by the officers of the credit department of the bank. In March of every year the firm submitted to the respective banks, with which it was doing business, a statement containing a trial balance from its books. These statements for the years of 1921, 1922, 1923, 1924, 1925, 1926, 1927 and 1928, show the assets and liabilities of the firm, but none of these statements show, as an asset owned by that firm, any cotton, except the statement of 1924. The balance sheet of 1924 shows that the firm owned 55 bales of cotton and held $675,-000 worth of cotton for its customers. The balance sheet of 1925 shows that the firm did not own any cotton, but held 1,500 bales for the account of its customers. The balance sheet of 1926 shows that the firm did not own any cotton, but held 10,067 bales of cotton valued at $877,000 belonging to its customers. The balance sheet for 1927 shows that the firm did not own any cotton, but held 7,285 bales of cotton belonging to its customers valued at $500,000.

It appears that Thompson & Company's affairs, due mainly to the critical illness of Mr. Thompson, while in a solvent condition, were not what they should have been, and its assets were depreciating in value. The Canal Bank, which also advanced money to the firm, required an

audit, which was furnished on May 11, 1927. This audit shows that the firm owned no cotton and held for the account of its customers 5,087 bales of cotton, of which 5,031 bales had been pledged to the banks to secure the personal indebtedness of that firm. The audit further revealed that Thompson & Company had substantially pledged all of its customers' cotton, valued at $360,000, to the bank for loans to the firm of nearly $480,000, when the total amount advanced against the cotton was $214,462.30. The audit further showed that $50,000 worth of cotton belonging to customers, where the firm had not made any advances against the same, was also pledged. It is admitted that a certified copy of this audit was placed in the hands of the officials of the Hibernia Bank and carefully scrutinized by them. The same auditors were then directed to make a special report, exclusively upon the subject of cotton belonging to customers, and the manner in which this cotton had been handled by Thompson & Company with the banks. On June 11, 1927, this supplemental report was furnished and it showed that 738 bales of cotton, valued at $53,956, belonging to customers who owed Thompson & Company nothing, had been pledged by the firm to the banks to secure its loans or indebtedness. The concluding paragraph of the report reads as follows:

"From the above figures it will be readily observed that of the 5087 bales of cotton valued at $364,992.25, Messrs. W. B. Thompson & Company have a total equity of $187,333.87 against which they have borrowed from various banks a total of $284,280.00 or $96,446.13 in excess of their equity."

The record shows that in September of 1927 the plaintiff shipped thirteen bales of cotton to Thompson & Company and that this cotton was immediately placed in the public warehouse and negotiable warehouse receipts obtained and then pledged to the Hibernia Bank as security for individual loans of Thompson & Company. The negotiable warehouse receipts covering the other four bales of cotton had been previously pledged to the New Orleans Bank and, during December, 1927, Thompson & Company, having paid the loan to the New Orleans Bank, obtained possession of these receipts and, during December, 1927, likewise pledged them to the Hibernia Bank as security for a loan by the bank to the firm.

Thus it will be seen that the officers of the bank knew, or should have known, to what extent Thompson & Company had been misappropriating the cotton of its clients in breach of its duty and the trust reposed in it. Consequently, when the bank received in pledge from Thompson & Company the warehouse receipts covering the plaintiff's cotton, it at least was bound to make inquiry concerning the ownership of these receipts and the right of Thompson & Company to pledge them, because the audit and supplemental report clearly revealed that Thompson & Company was pledging warehouse receipts covering cotton valued far in excess of amounts of advances made by it to its customers and, further, was pledging warehouse receipts of cotton held for the account of customers to whom it had not made any advances whatsoever, and that Thompson & Company did not own any cotton in its own right.

We, therefore, find that the bank had sufficient information to charge it with notice that these receipts did not belong to Thompson & Company and were being negotiated in breach of its trust and duty to its customers, and therefore the bank is

not an innocent holder in due course within the meaning of section 47 of Act No. 221 of 1908, the Uniform Negotiable Warehouse Receipts Act.

In view of our conclusion upon the first issue, it is unnecessary to consider the other most interesting legal questions presented.

For the reasons assigned it is ordered, adjudged and decreed that the judgment appealed from be and it is annulled, avoided and reversed, and that there now be judgment in favor of William M. Carnal, plaintiff herein, and against the Hibernia Bank & Trust Company, defendant, decreeing the plaintiff to be the owner and entitled to possession of the seventeen bales of cotton and the negotiable warehouse receipts covering them, as follows:

TAG NUMBERS:

J. 336219 to J 336222, incl., 4 bales cotton,
J 421147 to J 421149, incl., 3 bales cotton,
J 426127 to J 426128, incl., 2 bales cotton,
J 427209 to J 427210, incl., 2 bales cotton,
J 429495 to J 429498, incl., 4 bales cotton,
J 430103 to J 430104, incl., 2 bales cotton,

and ordering and condemning the said defendant, Hibernia Bank & Trust Company, to forthwith deliver, or cause to be delivered, the said cotton and negotiable warehouse receipts, and, in the alternative, if the said order and decree of the court is not complied with, that there be judgment in favor of plaintiff, William M. Carnal, and against the defendant, Hibernia Bank & Trust Company, for the value of the said cotton, namely, the sum of $1,700, with legal interest from judicial demand until paid. Defendant to pay the costs of both courts.

ON REHEARING

PER CURIAM.

We granted a rehearing in this case at the earnest insistence of counsel that the effect of our original opinion was to impugn the good faith of the officials of the defendant bank. The conclusion to this effect, it is said, is inevitable, because of section 58 of Act No. 221 of 1908, defining good faith as follows:

"A thing is done in good faith within the meaning of this act when it is, in fact, done honestly, whether it be done negligently or not."

Having held that the negotiation of the receipts by Thompson & Company to the bank was illegal because the bank was charged with notice of the deficiency of Thompson's title, it is argued that this conclusion necessarily involves some reflection upon the integrity of the bank's executives. We certainly had no such intention and our appreciation of the situation does not require a discussion of the moral character of the bank's action. In our view, section 47 of the act is applicable and not section 48. Under section 47 all that is necessary to defeat the right of the alleged innocent third holder is to show such facts as would charge him with notice of the defect in the title of the person under or through whom he claims. It is only in section 48 which, in our judgment, has no application here, that the question of good faith becomes of importance.

For these reasons we have concluded to adhere to our former opinion, which is made the final decree of the court.