## HEFFRON v. BANK OF AMERICA NAT. TRUST & SAVINGS ASS'N et al.

### In re WILLIAMS.

#### No. 9454.

Circuit Court of Appeals, Ninth Circuit.

June 29, 1940.

240

Russell B. Seymour, of Los Angeles, Cal., for appellant.

Louis Ferrari, of San Francisco, Cal., and Edmund Nelson, G. L. Berrey, and Grainger & Hunt, all of Los Angeles, Cal., for appellee Bank of America Nat. Trust & Savings Ass'n.

William R. Wallace, Jr., of San Francisco, Cal., Zach Lamar Cobb of Los Angeles, Cal., and George M. Burditt, of Chicago, Ill. (Williamson & Wallace, of San Francisco, Cal., of counsel), for appellee Lawrence Warehouse Co.

Before DENMAN, MATHEWS, and HEALY, Circuit Judges.

HEALY, Circuit Judge.

The appeal presents, among others of lesser difficulty, the question whether non-compliance with the provisions of the bulk sales law, Calif.Civil Code § 3440, invalidates a lien on the goods of a merchant in favor of the holder of receipts issued for the goods by a field warehouseman.

Fred Williams was adjudged bankrupt on his voluntary petition on September 25, 1937. The Bank of America, which we shall refer to as appellee, filed its proof of secured debt, claiming as security certain steel belonging to the bankrupt for which it held warehouse receipts. After a hearing upon objections of the trustee, the referee made findings and entered an order disallowing appellee's claim as a secured claim, but allowing it as a general claim. The court reversed the referee's order and directed the allowance of the claim as a secured claim.

The bankrupt, a wholesale and retail merchant in the city of Los Angeles, was engaged in the sale of unfabricated steel of various kinds and dimensions. He kept a portion of his inventory and maintained his office at 633 South Anderson Street, and deliveries were made from this address. A small part of the front was occupied by the bankrupt as his office and the balance of the building was used for the storage of steel, the warehouse portion being separated from the office by walls or partitions through which there was a door.

Desiring to procure credit on the security of his stock, the bankrupt on July 20, 1937, entered into a leasing and field warehouse storage agreement with the Lawrence Warehouse Company, operating an extensive system of field warehouses, to establish a warehouse on his premises. Under this agreement the bankrupt leased to the Warehouse Company the building mentioned, with the exception of the office, for the yearly rental of one dollar. The Warehouse Company undertook to act as custodian of all goods then on the premises and of any other goods placed there, in consideration of the sum of fifty cents per ton per month for goods stored which were covered by warehouse receipts, with a minimum charge of $500 for the first year. It conspicuously marked the building, inside and out, with "No Trespassing" placards and with large signs bearing the name of the Warehouse Company and a statement to the effect that "all commodities in or upon these premises are in the custody of the Lawrence Warehouse Company, Lessee". It placed in charge a man named Rennie as its bonded custodian.

Rennie had previously been employed by the bankrupt as his warehouse clerk. The new employment was at the same salary as previously received from the bankrupt, and as part of the compensation to the Warehouse Company for its services the amount of Rennie's salary was included. Padlocks bearing the name of the Company, to which the custodian had the only keys, were placed on the entrances to the warehouse, and the custodian kept the place locked when he was not present. With Rennie's permission the bankrupt had access to the warehouse. Except that he no longer drove a truck, Rennie continued to do the same character of work he had previously performed in and about the warehouse premises.

About July 28, 1937 the Warehouse Company issued non-negotiable warehouse receipts by the terms of which it acknowl-

edged receipt from the bankrupt of the steel therein described, and agreed to hold it subject to the written order of the California Bank. The receipts were delivered by the Company to the bankrupt and thereafter by the latter delivered to the California Bank as collateral for a present loan. A few days later the bankrupt negotiated for loans with appellee. As a result of the negotiations the bankrupt from time to time caused the Warehouse Company to issue additional non-negotiable warehouse receipts, which he delivered to appellee as security for loans. These, similar in form to the first, provided that the goods were to be held for the written order of appellee. The goods covered by receipts used in the transaction with the California Bank were included in receipts subsequently issued to appellee, and the loan of the California Bank was paid off from the new loans procured from appellee.

As warehouse receipts were issued, cards showing the name of the pledgee and the amount of steel covered were placed on the various piles of steel included in the receipts. These cards described the steel by number of pieces and their dimensions and referred to the warehouse receipts by number. While there was considerable "free" steel in the bins or shelves, it was the custom to separate the free goods from the pledged goods by a steel band or wire. No

pledged steel was sold without first procuring a release.

The referee inferred from these circumstances that there had been no immediate delivery, either to the Warehouse Company or to appellee, of any of the steel for which warehouse receipts had been issued, and that there was no actual and continued change of possession of any part of the goods. He concluded that the transfers were constructively fraudulent and therefore void as against the trustee in bankruptcy. The trial court rejected both the finding and the conclusion.

The referee further found that the transactions were otherwise than in the ordinary course of trade and not in the usual practice and method of business of the bankrupt, hence, no notice of the transfers having been given as required by the bulk sales law, § 3440 California Civil Code,[1] they were void. The court rejected this finding, also, but, going further, held that since the transactions were had in conformity with the Warehouse Receipts Act their validity was not impaired even though the transfers would otherwise have been invalidated by the bulk sales law.

The first question for our determination is whether there was an effective bailment of the steel to the Warehouse Company. The second is whether the bulk sales provision of the statute has any application, in

---

[1] "Every transfer of personal property, other than a thing in action, or a ship or cargo at sea or in a foreign port, and every lien thereon, other than a mortgage, when allowed by law, and a contract of bottomry or respondentia, is conclusively presumed if made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things transferred to be fraudulent, and therefore void, against those who are his creditors while he remains in possession, and the successors in interest of such creditors, and against any person on whom his estate devolves in trust for the benefit of others than himself, and against purchasers or encumbrancers in good faith subsequent to the transfer. * * *

"Provided, also, that the sale, transfer, or assignment of a stock in trade, in bulk, or a substantial part thereof otherwise than in the ordinary course of trade and in the regular and usual practice and method of business of the vendor, transferor, or assignor, and the sale,

transfer, assignment or mortgage of the fixtures or store equipment of a baker, cafe or restaurant owner, garage owner, machinist, or retail or wholesale merchant, will be conclusively presumed to be fraudulent and void as against the existing creditors of the vendor, transferor, assignor or mortgagor, unless at least seven days before the consummation of such sale, transfer, assignment or mortgage, the vendor, tran...eror, assignor or mortgagor or the intended vendee, transferee, assignee or mortgagee, shall record in the office of the county recorder in the county or counties in which the said stock in trade, fixtures or equipment are situated a notice of said intended sale, transfer, assignment or mortgage, stating the name and address of the intended vendor, transferor, assignor or mortgagor, and the name and address of the intended vendee, transferee, assignee or mortgagee, and a general statement of the character of the merchandise or property intended to be sold, assigned, transferred or mortgaged, and the date when and the place where the purchase price or consideration, if any there be, is to be paid."

view of the terms of the Warehouse Receipts Act, later enacted. If the latter question be answered in the negative, there will be no occasion·to consider other points discussed on the appeal.

■ (1) The circumstances disclose no mere colorable relinquishment of dominion over the goods. The substituted finding of the trial court of an immediate delivery to the Warehouse Company, followed by an actual and continued change of possession, is warranted by the proof. Compare Union Trust Co. v. Wilson, 198 U.S. 530, 25 S.Ct. 766, 49 L.Ed. 1154; Security Warehousing Co. v. Hand, 206 U.S. 415, 27 S.Ct. 720, 51 L.Ed. 1117, 11 Ann.Cas. 789.[2] There is nothing in McCaffey Canning Co. v. Bank of America, 109 Cal.App. 415, 294 P. 45, 53, to justify a contrary view.

■ As said in the McCaffey case, supra, "warehousing on the premises of the owner proposing to pledge his merchandise is effective when done in obedience to legal requirements." It is immaterial that the purpose of the warehousing is to enable the merchant to finance himself on the security of his goods by the use of warehouse receipts. Such is the primary and legitimate objective of modern field warehousing. Union Trust Co. v. Wilson, supra.

. (2) The California Warehouse Receipts Act, Deering's General Laws, 1937, Act 9059, enacted in 1909 and several times amended, expressly repeals all acts or parts of acts in conflict with·it. We are satisfied that´this statute exclusively governs the decision to be made here.

The act defines a warehouseman as "a person lawfully engaged in the business of storing goods for profit", section 58, and provides that "warehouse receipts may be issued by any´warehouseman". Section 1. Non-negotiable as well as negotiable receipts are recognized and protected. The act imposes upon the warehouseman the obligation to deliver the goods to the holder of the warehouse receipts, and he is made liable as for conversion in case of misdelivery and for damages caused ·by the non-existence of the goods.

As a condition to the validity and effectiveness of the receipts, the act does not in terms or by implication require notice to be given of the warehousing of the commodities they represent. Nor is notice to creditors of the bailor made a prerequisite of the issuance, negotiation or transfer of receipts. The act provides (§ 25) that in the case of goods delivered to the warehouseman by the owner, and for which a negotiable receipt is issued, the goods cannot be attached or otherwise levied upon while in the possession of the warehouseman, unless the receipt be first surrendered or its negotiation enjoined.

Of immediate significance here is § 42, providing that "a person to whom a receipt has been transferred but not negotiated, acquires thereby, as against the transferor, the title to the goods, subject to the terms of any agreement with the transferor." By notifying the warehouseman of the transfer to him of a non-negotiable receipt,[3] the holder acquires the direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt. "Prior to the notification of the warehouseman by the transferor or transferee of a non-negotiable receipt, the title of.the transferee to the goods and the right to acquire the obligation of the warehouseman may be defeated by the levy of an attachment or execution upon the goods by a creditor of the transferor * * *."

■ The inescapable implication of this provision is .that the goods are not subject to attachment or execution by creditors of the transferor—in this case the bankrupt—after the warehouseman has had notice of the transfer. The statute does more than fix the rights of the holders of warehouse receipts; it circumscribes as well the rights of creditors. In effect it .denies to creditors essential rights conferred by the bulk sales law.

■ The right is unconditionally bestowed on the owner of warehoused goods to convey or pledge his title by a transfer of the warehouse receipt. And it is inadmissible to suppose that the rights of the transferee may be defeated, or the transferee held liable as in conversion, because of the non-observance of formalities of which the act makes no mention. Indeed,

---

[2] Consult authorities cited in 12 Washington L. Review 20 (1937), "The Theory of Field Warehousing".

[3] Here the Warehouse Company was fully informed of the transfer of the re- ceipts, and all pledged goods in the warehouse were marked· to indicate that the receipts were .in the hands of the Bank.

the general scheme of the Warehouse Receipts Act to achieve uniformity, and to effect the secure and ready use of warehouse receipts as instruments of credit, is inconsistent with the notion that the business world must look to something other than the observance of the definite and comprehensive terms of the act itself. Compare Jewett v. City Transfer & Storage Co., 128 Cal.App. 556, 18 P.2d 351.

■ We conclude that the Warehouse Receipts Act repealed § 3440 so far as the latter might otherwise apply to warehoused goods.

The enactment in 1939 of § 3440.5 of the Civil Code [4] may fairly be considered as a move to clarify existing law or to remove doubts of the nature prompting the present litigation.

Affirmed.

---

[4] "Section 3440 of this code shall not apply to goods in a warehouse where a warehouse receipt has been issued therefor by a warehouseman as defined in the Warehouse Receipts Act, and a copy of such receipt is kept at the principal place of business of the warehouseman within the city or county in which is located the warehouse in which said goods are stored. Such copy shall be open to inspection upon written order of the owner or lawful holder of such receipt."