[Civ. No. 17189.   First Dist., Div. One.   Mar. 18, 1957.]

EVA CROW, Appellant, v. YOSEMITE CREEK COMPANY et al., Defendants; NORMA ZEMIRA SMITH, as Executrix, etc., Respondent.

Charles M. Stark and Paul W. McComish for Appellant.

S. B. Gill for Respondent.

AGEE, J. pro tem.*—This is an appeal from a judgment giving priority to a garnishment of an unliquidated credit over a subsequent assignment of such credit.

On December 22, 1952, Ralph B. Smith filed suit against Yosemite Creek Company for $150,000 and garnisheed the Crocker First National Bank for such amount. The bank answered, "No Fund." On said date, Yosemite owed the bank a balance of $21,912.50 on a promissory note executed on November 7, 1952. The bank held a nonnegotiable warehouse receipt, issued in its name, for 11,100 cases of canned figs stored by Yosemite, which receipt was so held under a general pledge agreement executed by Yosemite on the same date as the note. When the garnishment was levied upon the bank, it accelerated payment of Yosemite's note as provided in the pledge agreement and declared the entire balance immediately due and payable. The bank then caused the figs to be sold and the proceeds applied to payment of the note. After the note was paid in full, the bank had left in its hands the sum of $12,716.33, in which it disclaimed any interest.

On March 6, 1953, Yosemite assigned to its attorneys all

*Assigned by Chairman of Judicial Council.

of its interest in the figs and any proceeds therefrom. Notice of such assignment was given to the bank on the same day. On April 14, 1954, Smith obtained judgment against Yosemite for $55,183.73. On June 9, 1954, this action was commenced by the assignee of Yosemite's assignees to recover the said $12,716.33 being held by the bank. The bank deposited the money in court and, Smith having died, the executrix was substituted for the bank as defendant. The lower court held that the unliquidated credit of Yosemite was subject to the garnishment of December 22, 1952, and that such garnishment was prior in right to the assignment of March 6, 1953. This appeal by plaintiff followed from the resulting judgment awarding the $12,716.33 to Smith's executrix.

The only method in California to levy a garnishment upon pledged goods is by a levy upon the pledgee (bank) and not upon the pledged property. (*Treadwell* v. *Davis,* 34 Cal. 601; *Dubois* v. *Spinks,* 114 Cal. 289 [46 P. 95].) The levy on December 22, 1952, being prior in time to the assignment of March 6, 1953, is prior in right *if* such levy created a valid lien. (Civ. Code, § 2897.) The question is, of course, whether there was anything in the hands of the bank on December 22, 1952, which was capable of being attached by Smith.

Appellant's contention is that goods which have been warehoused, pursuant to the Warehouse Receipts Act (Deering's Gen. Laws, 1937, Act 9059) are not subject to attachment by a creditor of the transferor (Yosemite) after the warehouseman has had notice of the transfer.

Appellant relies upon *Heffron* v. *Bank of America,* 113 F.2d 239 [133 A.L.R. 203]. There the dispute was between the holder of a nonnegotiable warehouse receipt (a bank) and the trustee of a bankrupt's estate. The bankrupt had placed his entire stock of goods, consisting of unfabricated steel, under the warehousing agreement and had arranged to have his own premises used as the warehouse. The trustee claimed that the transfer by the bankrupt to the bank was void under the provisions of section 3440 of the Civil Code (bulk sales law) because there was no change of possession as required by that section. The court posed the question as to "whether the bulk sales provision of the statute [Civ. Code, § 3440] has any application, in view of the Warehouse Receipts Act, later enacted." (Pp. 241-242.) It then stated that if this question "be answered in the negative, there will be no occasion to consider other points discussed on the appeal." (P. 242.) The court then decided the question

in the negative. It stated, at page 243: "We conclude that the Warehouse Receipts Act repealed § 3440 so far as the latter might otherwise apply to warehoused goods." The judgment of the lower court allowing the bank's claim as a secured claim against the bankrupt's estate was thereupon affirmed.

However, there is dicta in the opinion which appears to lend support to appellant's contention. The court said, at page 242: "The inescapable implication of this provision [then section 42 of the Warehouse Receipts Act, now section 1858.70 of the Civil Code] is that the goods are not subject to attachment or execution by creditors of the transferor— in this case the bankrupt—after the warehouseman has had notice of the transfer." It is clear, however, that the court was only considering the claim of the holder of the warehouse receipt (the bank) and not the excess, if any, remaining after its loan had been paid in full. We do not consider that the dicta, quoted above, is applicable to the instant case. If, in the Heffron case, there had been any excess after the bank loan had been paid in full, we are certain that such excess would have gone to the trustee in bankruptcy.

The same court (C.C.A., 9th Cir.) later decided *Mount Tivy Winery* v. *Lewis*, 134 F.2d 120. There a winery stored wine in a warehouse and obtained warehouse receipts therefor, which it negotiated to a bank as security for credit financing. The bank required the same kind of pledge agreement as Yosemite executed in the instant case. The winery procured the buyers and handled all sale transactions, just as Yosemite did for Crocker. The federal government levied a floor tax on the wine under a statute providing for a tax on all wines "held by the producer thereof." (P. 122.) The winery contended that the wine was not being "held" by it and that all it had was "an inchoate right to receive the wine back at some future date, provided it paid its obligation to the Bank." (P. 123.) The court held that the winery had legal title to the wine and pointed out that section 58 (now Civ. Code, § 1858.04) provides that "owner" does not include "mortgagee" or "pledgee." It pointed out that the transaction was intended as a credit arrangement and not as a sale. The court quoted from section 42 (now Civ. Code, § 1858.70), putting emphasis on the latter portion, as follows: " 'A person to whom a receipt has been transferred but not negotiated, acquires thereby, as against the transferor, the title to the goods, *subject to the terms of any agreement*

*with the transferor.'*" (P. 123.) The court held that the agreement between the parties constituted a pledge and that the pledgor (winery) retained title and was the owner. It concluded that such title and ownership, although without possession, resulted in the wine being "held" by the winery within the meaning of the tax statute.

▉ Applying the rule of the Mount Tivy case, *supra,* to the instant case, it would seem clear that on December 22, 1952, Yosemite, as pledgor, held title and ownership to the figs subject to Crocker's right of possession and right to be paid its loan. After such loan was paid the bank should certainly not be allowed to retain any excess. Indeed, Crocker has made no such claim.

▉ The most impelling authority against the contention of appellant is to be found in the Act itself. Section 25 of the Act (now Civ. Code, § 1858.34) provides as follows: "If goods are delivered to a warehouseman by the owner . . . and a *negotiable* receipt is issued for them, they cannot thereafter, while in the possession of the warehouseman, be attached by garnishment or otherwise, or be levied upon under an execution, *unless* the receipt be first surrendered to the warehouseman, or its negotiation be enjoined." (Emphasis ours.) This section can only be read as meaning that goods held under a negotiable warehouse receipt can be attached or levied upon *if* the conditions therein stated are met. In view of the fact that the Act does not impose any conditions at all upon the attaching of goods held under a nonnegotiable receipt, it would indeed be strange if they could not also be attached.

Other jurisdictions have held that goods held under a nonnegotiable warehouse receipt are subject to attachment. (*Stone Leather Co.* v. *Henry Boston & Sons, Ltd.,* 234 Mass. 477 [126 N.E. 46]; *Edward L. Eyre & Co.* v. *Hirsch,* 36 Wn.2d 439 [218 P.2d 888].) In the Eyre case, *supra,* the plaintiff filed an action against one Hirsch and caused a writ of garnishment to be issued against a bank. The bank answered that it had warehouse receipts covering grain as security for Hirsch's indebtedness to it. The bank thereafter assigned the receipts to the warehouse company in return for the latter's payment of $8,012.98, which was the balance due on notes issued by Hirsch and held by the bank. The bank was held liable to the garnishor for the difference between this sum and the value of the grain covered by the receipts.

Appellant also contends that the relation of debtor-creditor would have had to exist *on December 22, 1952,* between Crocker, as debtor, and Yosemite, as creditor, in order for the garnishment to have created a lien. Appellant argues that the garnishor (Smith) had no greater right than his debtor (Yosemite) had against the garnishee (Crocker) at the time of the levy and that all that Yosemite had at that time was "the completely inchoate hope that there would be something left over when the bank had been paid."

Appellant cites a note in American Law Reports which states: "As a general proposition, money presently and unconditionally owing, but not payable until a future date, is subject to garnishment. See 12 R.C.L. title, Garnishment, page 779. But where a further performance of a contract is necessary before money payable thereon becomes due, the payment is conditioned on the performance, and is not subject to garnishment until the condition has been fulfilled." (2 A.L.R. 506.) Appellant argues that the further performance in question was the sale of the figs at a price greater than Crocker's loan and that, until this was done, Crocker did not owe anything to Yosemite or to an attaching creditor.

It should be noted that there was nothing left for Yosemite to do or perform in order to create an obligation by the bank to it. The bank accelerated the payment of its note on the date of the levy. Under the terms of the pledge agreement, it had the power of sale of the collateral. Although it may have been more convenient for the bank to have Yosemite negotiate the sales, it had the legal right and power to liquidate the collateral on its own initiative at any time after acceleration of the note.

In *Brainard* v. *Rogers,* 74 Cal.App. 247 [239 P. 1095], the court allowed garnishment of the proceeds of a fire insurance policy by creditors of the insured before the insured had executed and delivered a formal proof of loss or the insurance company had made an adjustment or appraisal of the loss. Thus, there was something to be done by the debtor (i.e., proof of loss) before the insurance company owed him anything and also something to be done by the insurance company (i.e., adjustment or appraisal) before the amount to be paid could be ascertained. As before stated, in the instant case there was nothing left for Yosemite to do or perform and the only thing remaining for Crocker to do was to sell the figs. The court in the Brainard case rejected the contention

that "the right [of the debtor] to sue at the date of the attachment is the true test." (P. 253.) It held: "[O]ur own search of the authorities satisfies us that the general rule is that the term 'debts' as used in attachment statutes, applies to either a matured or unmatured debt and that the present right to sue is not essential." (P. 253.)

Appellant also seems to contend that where the collateral is difficult to evaluate there is nothing in the hands of the garnishor that can be attached. Respondent, in reply, cites three cases in which the collateral consisted of notes of third persons held by the garnishee, which notes were in face amounts larger than the debt thereby secured. (*Robinson* v. *Tevis*, 38 Cal. 611; *William Deering & Co.* v. *Richardson-Kimball Co.*, 109 Cal. 73 [41 P. 801]; *Carter* v. *Los Angeles Nat. Bank*, 116 Cal. 370 [48 P. 332].) In each of the cited cases, the garnishor was held to be entitled to participate in the proceeds realized by the garnishee in excess of the debtor's obligation to the garnishee. Appellant distinguishes these cases on the ground that notes constitute a credit in a stated amount and that the excess remaining after the amount due the garnishee can be determined with accuracy. This entirely overlooks the obvious, that the value of such notes may or may not be their face amount.

In *Brainard* v. *Rogers, supra*, the court quoted (p. 251) from a Pennsylvania case as follows: "It is true, the value of the property may have to be ascertained, but this is not a serious difficulty, for there exists a standard for property in every community, viz., its market value. It is quite as easy to prove what one hundred bushels of wheat are worth which have been lost by fire, as what they would have been worth if sold, and the price claimed on a *quantum valebat*." Likewise, the market value of canned figs should not be difficult to ascertain.

We conclude that the levy upon Crocker was effective as to the interest which Yosemite then had in the figs or the proceeds therefrom. Any other result would allow a debtor to defeat all except one of his creditors by placing all of his assets under such a warehousing arrangement in favor of such one creditor. This would place beyond the reach of the other creditors all of such assets even when the holder of the warehouse receipt had a claim for far less than the value of said assets.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.