In the Matter of PINE GROVE CANNING COMPANY, Inc., Bankrupt.

No. 8913.

United States District Court
W. D. Louisiana,
Opelousas Division.

April 26, 1963.

Emile J. Duchamp, and J. Burton Willis, St. Martinville, La., for debtor.

Dubuisson & Dubuisson, William A. Brinkhaus, Opelousas, La., for trustee.

Chaffe, McCall, Phillips, Burke & Hopkins, John L. Toler, New Orleans, La., for American Can Co.

Vinson, Elkins, Weems & Searls, Joseph H. Stephens, Houston, Tex., and Davidson, Meaux, Onebane & Donohoe, Lafayette, La., for First City Nat. Bank of Houston.

Jack C. Fruge and J. B. Foret, Ville Platte, La., for American Security Bank of Ville Platte.

Milling, Saal, Saunders, Benson & Woodard, G. Henry Pierson, Jr., and Joseph E. Friend, and Paul J. Thriffiley,

Jr., New Orleans, La., for Whitney Nat. Bank of New Orleans.

Phelps, Dunbar, Marks, Claverie & Sims, John G. Weinmann, New Orleans, La., for Fidelity Deposit Co. and Phoenix Ins. Co.

Rudolph Schoemann, New Orleans, La., for Marquette Casualty Co.

Armentor & Armentor, Minos H. Armentor, New Iberia, La., for The People's Nat. Bank of New Iberia, La.

Leven H. Harris, Asst. U. S. Atty., Shreveport, La., and Fred J. Faust, Regional Counsel, Dallas, Tex., for Small Business Administration.

Landry, Watkins, Cousin & Bonin, Alfred S. Landry, New Iberia, La., for Nelius R. Bordelon.

Voorhies, Labbe, Voorhies, Fontenot & Leonard, Bennett J. Voorhies, Lafayette, La., for Continental Can Co., Inc.

Gibbons Burke, New Orleans, La., for Hibernia Bank of New Orleans, La.

PUTNAM, District Judge.

This matter is before us on petition for review of an order of the Referee rendered October 3, 1962 brought by Peoples National Bank of New Iberia, Whitney National Bank of New Orleans, American Security Bank of Ville Platte and First City National Bank of Houston, creditors of the bankrupt holding negotiable warehouse receipts issued by Teche Warehouse Company, this being a trade name employed by the warehouseman Nelius Bordelon.

The referee rendered an exhaustive opinion covering the operations of the bankrupt after a thorough hearing on the merits of the trustee's petition attacking the validity of the pledges held by the banks and negotiable warehouse receipts endorsed to them by the debtor, Pine Grove Canning Company, Inc. A complete hearing was had by the referee, with full opportunity to all interested parties to develop the facts.

■ It is doctrine that we must accept findings of fact by the referee unless they are found to be clearly errone-ous. Collier on Bankruptcy, § 39.28, Vol. 2 p. 1514–1528; Bankruptcy Order 47, 11 U.S.C.A. following section 53; Allen v. Lokey, Trustee, 307 F.2d 353 (5 Cir. 1962), and authorities cited. The Court finds that the referee, Hon. LeRoy Smallenberger, has correctly and fully stated the facts in his memorandum of October 3, 1962, and adopts them as its own.

Briefly stated, the record shows that Pine Grove operated canning factories in St. Martinville and Ville Platte, Louisiana, where it carried on the business of canning agricultural products purchased in the surrounding area. It was a sizable industry, and in order to finance the purchase, processing and canning of agricultural products for the trade, the company commenced a field warehousing operation during 1949 or the early 1950's. Originally, Mr. Emile Duchamp of St. Martinville, a practicing attorney, acted as the warehouse operator. Subsequently, Mr. Nelius Bordelon, an automobile dealer of St. Martinville, was prevailed upon to take this assignment. It is the gist of his testimony that he was an absolute figurehead, and felt he was rendering a community service. All control of the "warehouses", which were located on the bankrupt's property, together with the canned goods purportedly stored therein, remained with Pine Grove and its officers, directors and employees. Apparently, Mr. Bordelon's sole function was to make application for the warehouse license every two years, furnish the required bond to underwrite the operation, and sign negotiable warehouse receipts when presented to him by Pine Grove employees.

Pine Grove transferred these negotiable warehouse receipts to the banks under agreements with them that they be held in pledge until sale of the goods; when they were sold, payments were made on the notes and the warehouse receipts surrendered for cancellation or for partial release, these entries being made at Mr. Bordelon's office where the receipt books were kept during the last two years of the arrangement. We add that he caused the receipt books to be

brought to his office at the insistence of Mr. Daigle, a State Warehouse Inspector employed by the Louisiana Warehouse Commission. These books were formerly in the possession and control of Pine Grove employees.

Several years before the bankruptcy, First City and American Security commenced dealing directly with the debtor. In 1959 Peoples, Whitney and American Can Company entered into an agreement for loans up to $500,000.00, with additional credit for cans sold to Pine Grove in the amount of $155,000.00. Peoples acted as the direct lending bank, being "on the ground" so to speak in close geographical proximity to St. Martinville. All four banks continued to do business with Pine Grove until its bankruptcy.

Bordelon obtained a "State Regulated Farmers' Warehouse" license by application to the Louisiana Warehouse Commission, pursuant to LSA–R.S. 54:241 et seq. and regulations issued by the Commissioner under authority of LSA–R.S. 54:247. Aside from obtaining the license, the regulations and the laws requiring posting of signs, segregation of goods, separation and identification of lots of goods according to warehouse receipt, etc., were ignored.

The referee found that these canned goods, consisting of corn, sweet potatoes and other vegetables, in varied can sizes, were not fungible, in which finding we likewise concur.

Upon this record, the referee disallowed the claims of the banks as preferred creditors. Able and diligent counsel now urge upon the Court many specifications of error as to the facts found by him, which we have disposed of by the foregoing discussion. The question most seriously urged and, in our opinion the only and decisive issue remaining, is whether or not under the Uniform Warehouse Receipts Act, adopted in this State in 1908, now appearing as LSA–R.S. 54:1–59, and the pertinent provisions of the Louisiana Revised Civil Code of 1870, under the title "Of Pledge", a creditor may take commodities of his debtor represented by negotiable warehouse receipts in pledge, pursuant to a field warehousing plan such as we have here described, without requiring other evidence that the warehouses were properly operated.

It is the banks' contention that they were entitled to rely upon the warehouse receipts, negotiable in form, issued by Bordelon, a duly licensed and bonded warehouseman. This claim is bottomed upon LSA–R.S. 54:40, 41, 47, and 58, and LSA–C.C. Art. 3158.[1]

In respect to notice of the situation existing at the debtors' plant and ware-

1. LSA–R.S. 54:40 "A negotiable receipt may be negotiated by any person in possession of the same, however such possession may have been acquired, if, by the terms of the receipt, the warehouseman undertakes to deliver the goods to the order of such person, or if, at the time of negotiation, the receipt is in such form that it may be negotiated by delivery."

LSA–R.S. 54:41 "A person to whom a negotiable receipt has been duly negotiated acquires thereby:

"(1) Such title to the goods as the person negotiating the receipt to him had or had ability to convey to a purchaser in good faith for value, and also such title to the goods as the depositor or person to whose order the goods were to be delivered by the terms of the receipt had or had ability to convey to a purchaser in good faith for value; and

"(2) The direct obligation of the warehouseman to hold possession of the goods for him according to the terms of the receipt as fully as if the warehouseman had contracted directly with him."

LSA–R.S. 54:47 "The validity of the negotiation of a receipt is not impaired by the fact that such negotiation was a breach of duty on the part of the person making the negotiation, or by the fact that the owner of the receipt was deprived of the possession of the same by loss, theft, fraud, accident, mistake, duress, or conversion, if the person to whom the receipt was negotiated, or the person to whom the receipt was subsequently negotiated, paid value therefor, in good faith, without notice of the breach of duty, or loss, theft, fraud, accident, mistake, duress, or conversion."

LSA–R.S. 54:58 "In this Chapter, unless the context or subject matter other-

houses, petitioners point to monthly reports issued by the state warehouse inspector indicating that the warehouse receipts were in order and goods represented thereby were on hand as late as October, 1959. It was not until October 19, 1959, that the inspector issued an unfavorable report, showing a shortage of some 40,000 cases of canned goods. These proceedings were commenced on October 24, 1959, the inventory taken by the trustee showed a shortage of 59,834 cases. The referee states, at page 11 of his opinion herein, that:

"Although the President of Peoples Bank testified that he was not aware of any discrepancies in the operation of the warehouses, he was informed by both the warehouse Examiner and the State Warehouse Commissioner on separate occasions, many months before the attempted corporate reorganization, that the warehouses were overcrowded and the canned goods could not be identified by lot numbers. Carnal v. [W. B.] Thompson [& Co.], 16 La. App. 192, 132 So. 149 [133 So. 449]."

Thus, the referee who saw and heard the witnesses testifying as to the knowledge of Peoples and Whitney of the situation of their security, finds specifically that these two creditors at least were not without notice thereof. This is more apparent from a reading of Carnal v. Thompson & Co., 16 La.App. 192, 132 So. 149, on reh. 133 So. 449 (1931), to which he refers.

In Carnal the creditor had taken negotiable warehouse receipts in pledge for the individual debt of a cotton broker. The Court found that the bank had in its possession information indicating that the debtor owned no cotton himself. It was established that he had in fact obtained and negotiated to the bank warehouse receipts on cotton belonging to his customers. With reference to Section 47 of Act 221 of 1908, (LSA–R.S. 54:47), the Court said:

"In the light of this section the person to whom a receipt has been negotiated takes nothing by the transfer, if he had notice of a breach of trust or duty on the part of the person making the negotiation. Notice, in its accepted legal sense, *means such information on the part of the person charged with notice as would put a prudent person on inquiry to ascertain the true or actual facts.*" (132 So. 152. Emphasis Supplied.)

On rehearing, it was urged that the holding of the Court was tantamount to an imputation of bad faith on the part of the bank, in view of Section 58 of the act, now LSA–R.S. 54:58, the concluding paragraph of which, as previously noted [2] states that a thing is done "in good faith" if in fact done honestly, whether it be done negligently or not. This con-

wise requires: * * * A thing is done 'in good faith' within the meaning of this Chapter when it is in fact done honestly, whether it be done negligently or not."

LSA–C.C. Art. 3158 "But this privilege shall take place against third persons only in case the pledge is proved by some written instrument, in which shall be stated the amount of the debt intended to be secured thereby, and the species and nature of the thing given in pledge; or the description of the thing pledged may be contained in a list· or statement annexed to the instrument of pledge and giving its number, weight or descriptive marks.

" * * * the delivery of property on deposit in a warehouse, cotton press, or on storage with a third person, or repre-

sented by a bill of lading, shall pass to the pledgee by the mere delivery of the warehouse receipt, cotton press receipt, bill of lading, or storage receipt, showing the number, quantity or weight of the things pledged; and such pledge so made, without further formalities, shall be valid as well against third persons as against the pledger thereof, if made in good faith. Such receipts shall be valid and binding in the order of time in which they are issued for the number, quantity, or weight of the things pledged, if there should not be enough to meet all receipts so issued. * * *" (As amended by Acts 1900, No. 157, § 1; Acts 1952, No. 290.)

2. Note 1, supra.

tention was rejected by the Court, on the theory that Section 58 did not govern the situation.

█ We note at this point that originally Section 47 of Act 221 of 1908 did not embody the words "in good faith". The uniform law was amended in 1922 to insert this phrase into the section, but it was not until 1932 that Louisiana incorporated the change by Act No. 239 of that year. The action of the Legislature was no doubt prompted by the decision of Carnal v. Thompson & Co., supra, which was handed down in 1931. There is no suggestion here that the banks did not act "in good faith", that is, honestly and without any culpable motive or intent. We conclude that the requirement that the purchaser be "in good faith" is in addition to the proviso that he must be also "without notice of the breach of duty" in order to claim the benefit of this Section, so that a failure to meet either test destroys the validity of the negotiation of such warehouse receipts, at least as to third persons not privy to the transaction.

██ In Louisiana the requirement of delivery of the thing pledged to the creditor is essential to the validity of the pledge. LSA–Civil Code, Art. 3152. In the case of a pledge of movables, Article 3162 recognizes further that the property must be put in possession of the creditor, or of a third person agreed on by the parties. Article 3158 imposes the necessity for a written instrument as evidence of the contract of pledge, there being no other requirement as to form, and again emphasizes the necessity for actual delivery of the property to the creditor. As demonstrated in the language of this latter Article, in the case of articles stored in warehouses, delivery passes to the pledgee by delivery of the warehouse receipt, which is sufficient to render the contract valid even against third persons if made in good faith. There is no radical difference in the essential requirements for possession of the pledged property in the creditor under the civil law as it obtains here, or under the common law.

Able counsel for these litigants have favored us with exhaustive briefs, citing many cases from other jurisdictions dealing with field warehousing. It is recognized in practically all of these cases that field warehousing, properly conducted, with possession and control of the commodity stored removed from the owner and vested in the warehouseman, is a valid, useful and in some cases necessary financial arrangement. It is not a new device by any means; the decisions of our courts touching upon such operations are legion. See Am.Law Institute Restatement of the Law, Security § 11d, p. 43; 56 Am.Jur. Warehouses, § 85–94; 93 C.J.S. Warehousemen & Safe Depositories § 1, n. 35; Heffron v. Bank of America, 113 F.2d 239, 133 A.L.R. 203 (9 Cir. 1940); Ribaudo v. Citizens Nat. Bank of Orlando, 261 F.2d 929 (5 Cir. 1958); and the exhaustive discussion in annotation appearing in 133 A.L.R. 209, et seq.

█ Generally speaking, the so-called field warehouse differs from the usual concept of warehousing in that it is located on property belonging to the debtor, and is operated for his exclusive benefit. The service is not offered to the general public. Thus, the cases cover a wide range of decision when resolving the difficult questions arising from the security device of pledge and its sacremental concept of possession in the creditor, with the symbolic delivery and possession of goods in storage, following upon endorsement and negotiation of a negotiable warehouse receipt. The test is actual control and possession of the goods in the warehouseman. No one element of possession is necessarily determinative, but each case must be decided upon its own facts, with reference to local statutory provisions.

█ Accordingly, we hold that a lack of possession and control in the warehouseman, coupled with a lack of compliance with the laws and regulations pertaining to warehouse operation and the warehouse receipts Act, destroys the validity of a so-called "field warehouse arrangement". This being true, a ne-

gotiable warehouse receipt attempted to be issued for goods stored in such a warehouse is no receipt at all, and is entitled to no more consideration where the rights of third parties intervene than it would be given if it were in fact fictitious or forged. It is not such a receipt as will carry with it possession of the goods purportedly represented thereby to a pledgee of such goods, as is contemplated by LSA–Civil Code, Art. 3158.

■ The overwhelming evidence here is to the effect that all of the banks in question knew of the field warehousing arrangement, knew that virtually all of the stock in trade of their debtor was kept in these warehouses and covered by warehouse receipts, and knew of the dangers inherent in such a system insofar as actual physical possession of their pledged goods was concerned. As reasonable and prudent persons it was incumbent upon them to check their security, at least to the extent of determining whether or not a bona fide field warehouse was in fact in existence. This duty is imposed by the requirements of LSA–R.S. 54:47, recognized in the case of Carnal v. Thompson & Co., supra.

■ Under the great weight of authority, control and possession of the pledged commodities in the warehouseman was essential to the banks' position as pledgees of these goods. 133 A.L.R. 209, § 1, p. 234, "Agreement Intending

Warehousing"; Slovenko, "Of Pledge", 33 T.L.R. 59, p. 91 et seq.; A.L.I. Restatement, Security, Sec. 11(d), p. 42 supra. As a result of their laxity in this case, these creditors are unable to identify any of the goods purportedly pledged to them, and cannot now be allowed to claim the entire contents of the warehouse to the prejudice of unsecured creditors holding claims in excess of $450,000.00. The Trustee occupies the position of a seizing creditor under an ordinary judgment. L.S.A.–C.C.P. art. 2292 et seq. Bankruptcy Act § 70, sub. c, 11 U.S.C.A. § 110 sub. c; National Oats Co. v. Long, 220 F.2d 745 (5 Cir. 1955); MacKay v. Trusco Finance Co., 198 F.2d 431, 433 (5 Cir. 1952). As such, he prevails over an imperfect pledge or other security device.

This view of the case makes it unnecessary to discuss other issues suggested by the record but not raised by the parties. These are whether or not the canned food products of Pine Grove were "farm products" within the contemplation of the State Regulated Farmers' Warehouse Law,[3] and whether or not the situation in this case was such as to violate rights of ordinary creditors under the Louisiana Bulk Sales Act,[4] or the fact that the warehouses were located at places other than the address stated in the license.[5]

We, therefore, affirm the decision of the Referee.

3. LSA–R.S. 54:244 reads "The provisions of this Chapter apply only to warehouses storing farm products and then only insofar as the storage of these farm products is concerned." All other warehouses in Louisiana must be licensed pursuant to LSA–R.S. 54:111–117, on petition addressed to the Court with judicial approval of location and bond made a condition precedent to issuance of certificate.

4. LSA–R.S. 9:2961 et seq. (Uniform Bulk Sales Act).

5. License No. 774 issued to Teche Warehouse Company and effective from Nov. 3, 1958 to Nov. 3, 1959, gives location of warehouse as 110 East Berard Street, St. Martinville, La., which is not the actual site of warehouses in this case. See Supervisor of Public Accounts v. Patorno Wines & Distilling Corp., 181 La. 814, 160 So. 423 (1935) dealing with license issued pursuant to LSA–R.S. 54:111–117, supra, note 3. Here, the parties seem to have treated this discrepancy as a clerical error, further, the exact location is not required to be stated if the warehouse is properly a farmers' warehouse under LSA–R.S. 54:244.